## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF DELAWARE

x------------------------------------x
In re:                               :   Case No. _____

AllServe Systems Corp.,              :

         Debtor.            :

x------------------------------------x   :

AllServe Systems PLC and AllServe    :
Systems, Inc.,                       :

         Plaintiffs,        :

    v.                              :

Aegis Communications Group, Inc.,    :

         Defendant.         :

x------------------------------------x

## NOTICE OF REMOVAL

      Charles A. Stanziale, Jr., Chapter 7 Trustee for the estate of AllServe Systems Corp., an affiliate of AllServe Systems, Inc., ("AllServe") and Finbarr O'Connell, Administrator for AllServe Systems PLC (AllServe PLC"), a United Kingdom corporation in a U.K. insolvency proceeding, by and through their respective counsel indicated below respectfully states:

      1.    In November 2005, AllServe PLC was placed in administration in the United Kingdom and on November 16, 2005, Finbarr O'Connell of KPMG was appointed Administrator of AllServe PLC.

      2.    On November 18, 2005, AllServe filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Code"). On December 8, 2005, Bunce D. Atkinson was appointed Chapter 11 Trustee for AllServe.

3.     On January 18, 2006 the AllServe case was converted to a Chapter 7 proceeding.

4.     On January 20, 2006, Charles A. Stanziale, Jr. was appointed the Chapter 7 Trustee for the estate of AllServe.

5.     On June 6, 2006 the United States Bankruptcy Court for the District of New Jersey entered an Order in the AllServe case extending the time within which the Chapter 7 Trustee may file Notices of Removal under Bankruptcy Rules 9027 and 9006 for a period of sixty (60) days.

6.     On or about November 12, 2003, a Verified Complaint was filed on behalf of AllServe and AllServe PLC in an action entitled *AllServe Systems PLC and AllServe Systems, Inc. v. Aegis Communications Group, Inc.,* C.A. No. 061-N ("Chancery Action") which is presently pending in the Court of Chancery of the State of Delaware. The Chancery Action alleges damages exceeding Fifty Million Dollars ($50,000,000.00). A copy of the Chancery Action is attached hereto as Exhibit A.

7.     AllServe, through its counsel, Greenberg, Traurig LLP and AllServe PLC, through its counsel, Heckler & Fabrizzio and Wilentz, Goldman & Spitzer, hereby petition for removal to the United States District Court for the District of Delaware, the entire pending Chancery Action pursuant to 28 U.S.C. §1452 and Bankruptcy Rule 9027. Furthermore, upon removal, AllServe and AllServe PLC intend to move to transfer the pending Chancery Action to the United States District Court for the District of New Jersey in order that the matter be referred to the United States Bankruptcy Court for the District of New Jersey pursuant to the Standing Order of Reference dated, July 23, 1984.

2

8.    The facts upon which AllServe and AllServe PLC rely on in filing the within Notice of Removal include, but are not limited to, the fact that the claims set forth by them effect the administration of AllServe's estate (as well as the U.K. proceeding involving AllServe PLC), and thereby qualify as a core proceeding pursuant to 28 U.S.C. §157(b) (2) (A) (B) and (O), or otherwise involve substantive rights of AllServe under Title 11 of the Bankruptcy Code.   To the extent any claim or cause of action in the Chancery Action removed is considered non-core, AllServe consents to the entry of the final orders or judgments by the Bankruptcy Judge.

Dated: August _3_ , 2006

HECKLER & FABRIZIO

Richard D. Abrams, Esquire
The Corporate Plaza
800 Delaware Avenue, Suite 200
Wilmington, DE 19801
*Attorneys for AllServe Systems PLC*

and

Edward T. Kole, Esquire
Wilentz Goldman & Spitzer
90 Woodbridge Center Drive
Woodbridge, NJ 07095
*Attorneys for AllServe Systems PLC*

GREENBERG TRAURIG LLP

Dennis A. Meloro, Esquire (No 4435)
The Nemours Building
1007 North Orange Street
Suite 1200

Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
and
Diane E. Vuocolo, Esquire
Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 988-7803
Facsimile: (215) 717-5230
*Attorneys for Charles A. Stanziale, Jr.,*
*Chapter 7 Trustee for the Estate of*
*AllServe Systems Corp., an affiliate of*
*AllServe Systems, Inc.*

and

Of Counsel
Jeffrey Bernstein, Esquire
McElroy, Deutsch, Mulvaney & Carpenter
LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102-4079
(973) 622-7711
fax (973) 622-5314
*Attorneys for Charles A. Stanziale, Jr.,*
*Chapter 7 Trustee for the Estate of*
*AllServe Systems Corp., an affiliate of*
*AllServe Systems, Inc.*

4

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| AllServe Systems PLC and AllServe Systems, Inc., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| Aegis Communications Group, Inc., | ) ) ) | |
| Defendant. | ) ) | |

## VERIFIED COMPLAINT

Plaintiffs, AllServe Systems PLC ("AllServe") and AllServe Systems, Inc. ("Merger Sub") (collectively, the "Plaintiffs"), by and through their undersigned counsel, allege for their verified complaint against Aegis Communications Group, Inc. ("Aegis" or "Defendant") as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract and breach of the duty of good faith and fair dealing arising out of the willful and wrongful breach by Aegis of an Agreement and Plan of Merger by and among AllServe, Merger Sub and Aegis dated July 11, 2003 (the "Merger Agreement").   (A true and correct copy of the Merger Agreement is attached as Exhibit A.)

2.     The Plaintiffs in this action seek, *inter alia*, an order and judgment:

(a)     preliminarily and permanently restraining Defendant from consummating the proposed transaction with Deutsche Bank and Essar Group;

(b)    declaring that Defendant breached and improperly terminated the Merger Agreement, such that the Merger Agreement remains in full force and effect;

(c)    specifically enforcing the Merger Agreement;

(d)    alternatively, directing Defendant to pay Plaintiffs damages, including loss benefit of the bargain inherent in the merger and expenses, arising from Defendant's failure to close the merger, breach of the duty of good faith and fair dealing, breach of the non-solicitation clause and improper termination; and

(e)    directing that Defendant pay AllServe the break-up fee of $1,137,500, as well as costs including attorneys fees incurred in connection with an action to collect the break-up fee, as required by the Merger Agreement.

## THE PARTIES

3.    AllServe is a United Kingdom corporation with its principal place of business in Ascot, United Kingdom.

4.    Merger Sub is a Delaware corporation with its principal place of business in North Brunswick, New Jersey.  Merger Sub is a wholly owned subsidiary of AllServe.

5.    Aegis is a publicly held Delaware corporation with its principal place of business in Irving, Texas.

6.    The Merger Agreement provides that it is governed by Delaware law. (Exhibit A at Section 10.11.)

## FACTUAL BACKGROUND

7.    AllServe is a privately held IT-enabled services company.

8.    Aegis is a telecommunications based marketing, customer service and call center management company.

9.    On or about July 11, 2003, after an extensive sale process conducted by Aegis and lengthy negotiations between AllServe and Aegis, AllServe, Merger Sub and Aegis signed the Merger Agreement.  The Merger Agreement provided, among other things, that AllServe and Merger Sub would pay $22,750,000 to Aegis and that Merger Sub would be merged into Aegis with Aegis being the surviving entity (the "Merger"). The newly merged Aegis would be the wholly owned subsidiary of AllServe.  The $22,750,000 would be used to pay various outstanding pre-merger debt obligations of Aegis, retention bonuses to certain employees, deal expenses and to fund an escrow account to secure indemnity obligations of Aegis.

10.    The Merger Agreement contained an exclusivity (or "no shop") provision which provided that Aegis and its representatives may not "initiate, take any action to facilitate, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other person relating to the acquisition by such other person of [Aegis]." (Exhibit A at Section 5.03(a)).

11.    Aegis' Board of Directors recommended to Aegis' shareholders that they vote to approve the Merger.  On or about September 9, 2003, Aegis' shareholders approved the proposed Merger.  AllServe and Merger Sub thereafter worked diligently to satisfy the remaining conditions to closing.  Aegis, at least initially, appeared also to be working to satisfy the remaining conditions.

## AEGIS BREACHED THE MERGER AGREEMENT

12.    In an effort to bring the transaction to closing, on October 21, 2003, Plaintiffs gave notice to Defendant that all conditions set forth in Article VII of the Merger Agreement had been satisfied (or were to be satisfied at the closing) or waived.

Pursuant to Section 1.02 of the Merger Agreement, the parties were required to close the transaction within three business days thereafter, and accordingly, Plaintiffs' notice provided that the closing of the Merger would take place on Friday, October 24, 2003. (A true and correct copy of the notice is attached as Exhibit B.) On October 22, 2003, Defendant acknowledged that it had received Plaintiffs' October 21st notice but stated that it was unable or unwilling to close. Defendant's reasons for not being prepared to close included the fact that its Board was considering other potential proposals, and a number of other "make-weight" excuses. (A true and correct copy of Defendant's letter dated October 22, 2003 is attached as Exhibit C.) Defendant clearly stated, however, that it was not terminating the Merger Agreement -- nor, of course, did it have grounds to do so.

13.    Upon information and belief, in an effort to derail the closing, on October 23, 2003 (the day before the closing was required to take place), Aegis "supplemented" its disclosure to AllServe, disclosing for the first time material information including: (a) Aegis' purported pre-paid deal expenses; (b) a potential $950,000 decline in expected revenue from its client, Trilegient, based on a change in accounting practices; (c) Aegis' failure to accrue bonuses for its senior executives; and (d) a previously undisclosed post-signing expenditure of $500,000 on technology upgrades incurred without the required consent of AllServe (collectively the "Supplemental Disclosures"). The facts underlying these disclosures had been known to, but not disclosed by, Aegis for some time prior to October 23rd. The Supplemental Disclosures made clear that Aegis would have substantially less net working capital at closing than Aegis had previously disclosed.

14.     Notwithstanding these last minute disclosures, Plaintiffs were ready and willing to close on October 24, 2003 (and address any shortfalls in net working capital post-closing as was expressly contemplated by the Merger Agreement) and repeatedly notified Defendant of this.  (True and correct copies of Plaintiffs' letters dated October 21[1] and 24, 2003 are attached as Exhibits D and E.)  Nevertheless, Defendant did not attend the closing and, in breach of the Merger Agreement, failed to close the Merger as required by the Merger Agreement.  (Exhibit A at Section 1.02.)

15.     After Defendant failed to close the Merger as required on October 24, 2003, Plaintiffs' counsel informed Defendant that it intended to sue Aegis and seek specific performance of the Merger Agreement.  Defendants requested that Plaintiffs forbear from pursuing legal remedies while its Board of Directors continued to meet and discuss the issue.

16.     Late in the day on October 29th, Defendant's counsel informed Plaintiffs' counsel that Aegis' Board of Directors had decided to close the Merger with AllServe and requested a meeting at the offices of AllServe's counsel on October 31st to try to close. At that meeting, which was attended by Plaintiffs' UK based Chairman and President but not Defendant's US based Chief Executive Officer, Plaintiff's counsel met with Defendant's attorney and worked in good faith to attempt to resolve the issues raised by the Supplemental Disclosures and close the Merger.  Defendant refused to negotiate, was unwilling to try to resolve the issues set forth on the Supplemental Disclosures, and indeed informed AllServe that prior to closing Aegis would require a waiver of the disputed items in the Supplemental Disclosures.  Aegis refused to close or negotiate in

---

[1] (The letter was inadvertently dated October 21st, but drafted and sent October 23rd.)

good faith saying only that they would discuss the potential Merger with AllServe at a board meeting later that afternoon. Thereafter, Aegis refused to tell AllServe the results of the board meeting. Accordingly, the Merger did not close.

17.    Plaintiffs continued to attempt to negotiate so as to close the Merger. Plaintiffs have throughout wanted to close but Defendant's continued delay has thwarted these efforts.

18.    On November 5, 2003, Defendant informed Plaintiffs that Defendant was "terminating" the Merger Agreement on the grounds that the Aegis Board of Directors had decided to accept a purported "Superior Proposal" from Deutsche Bank and Essar Group (the "Deutsche Bank/Essar Transaction"), which Defendant claimed would be closed on that very same day. (A true and correct copy of the November 5th purported termination is attached as Exhibit F.) In that notice, Defendant indicated it did not intend to pay AllServe the break-up fee required by Sections 9.01 and 9.02 of the Merger Agreement (the "Break-Up Fee").

19.    Upon information and belief, the so-called Superior Proposal was the result of Aegis' soliciting an alternative proposal from Deutsche Bank/Essar.    In particular, Mr. Schwarz, Defendant's CEO, admitted to an AllServe representative that, after the Merger Agreement had been signed, a representative of the Essar Group told Mr. Schwarz, in words or in substance, that Aegis was agreeing to merge at a very low price. Mr. Schwarz responded to the Essar Group representative by saying, in words or in substance, that the Essar representative "should make Aegis an offer". Upon information and belief, the Essar Group thereafter did so -- resulting in the purportedly "Superior Proposal." Mr. Schwartz's conduct was in direct violation of the exclusivity provision.

20.    On November 6, 2003, Plaintiffs demanded that Defendant pay the requisite Break-Up Fee, as provided for in Section 9.02(c) of the Merger Agreement. Plaintiffs further reserved all rights and remedies in respect to Defendant's breaches of the Merger Agreement. (A true and correct copy of the November 6th demand is attached as Exhibit G.)

21.    By letter dated November 7, 2003, Defendant's counsel stated that the Break-Up Fee was not owed and confirmed that Defendant did not intend to pay part or all of the Break-Up Fee. Aegis further demanded payment of its expenses. Aegis never identified any factual basis for not paying the Break-Up fee. (A true and correct copy of the November 7th letter is attached as Exhibit H.)

22.    Plaintiffs have expended an enormous amount of time, effort and resources in identifying Aegis as a merger candidate and in pursuing and preparing for the proposed Merger with Aegis. As a result of Aegis' wrongful conduct, AllServe is being denied the benefit of its contractual bargain and is threatened with the loss of its opportunity to acquire a unique business.

## COUNT I
### (BREACH OF CONTRACT- FAILURE TO CLOSE)

23.    Plaintiffs repeat and reallege each and every allegation made in paragraphs 1 through 22 as if set forth fully herein.

24.    According to the Merger Agreement, Aegis became obligated to close "as of the close of business on the third business day after the satisfaction or waiver of the conditions set forth in Article VII." (Exhibit A at Section 1.02.)

25.    On October 21, 2003, Plaintiffs notified Aegis that all of the conditions set forth in Article VII of the Merger Agreement had been either waived or satisfied. Aegis was thus obligated to close the transaction on October 24, 2003.

26.    No party to the Merger Agreement terminated, attempted to terminate, or purported to terminate the Merger Agreement prior to the scheduled closing on October 24, 2003. The Merger Agreement therefore remained in full force and effect.

27.    Plaintiffs fulfilled their obligations under the Merger Agreement and were prepared to close the Merger on October 24, 2003.

28.    Once Aegis' obligation to close under the Merger Agreement matured, Aegis no longer had a right to terminate the Merger Agreement. Aegis failed to comply with its obligation to close on October 24, 2003, and has thus breached the Merger Agreement.

29.    Aegis' breach of the Merger Agreement has caused and threatens to cause Plaintiffs continuing irreparable harm and/or substantial damages.

30.    Plaintiffs have no adequate remedy at law.

### COUNT II
### (BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING-FAILURE TO CLOSE)

31.    Plaintiffs repeat and reallege each and every allegation made in paragraphs 1 through 30 as if set forth fully herein.

32.    Aegis agreed to use its best efforts to consummate and make effective the Merger Agreement:

> SECTION 6.04.    Additional Agreements.    Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all commercially reasonable efforts to take promptly, or cause to be done promptly, *all actions and to do promptly, or cause to be done promptly, all things necessary, proper or advisable under applicable laws and*

*regulations to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including using efforts to obtain all necessary actions or non-actions, extensions, waivers, consents and approvals from all applicable Governmental Entities, effecting all necessary registrations, applications and filings and obtaining any required contractual consents and regulatory approvals.*

(Emphasis added.)

33.    In addition, Aegis owed AllServe a duty of good faith and fair dealing, which was inherent in the Merger Agreement.

34.    Aegis gave Plaintiffs eleventh-hour notice -- via the Supplemental Disclosures -- that the representations contained in Aegis' covenants were inaccurate or untrue.  Aegis' Supplemental Disclosures further evidenced material breaches of the covenants contained in the Merger Agreement.  Upon information and belief, the purpose of both: (a) providing the aforementioned Supplemental Disclosures; and (b) the purpose of providing them on the eve of closing, was to delay the closing or cause Plaintiffs to seek to terminate the Merger Agreement.

35.    Rather than facilitating the closing, and in violation of Aegis' express, contractual obligation and the implied obligations of good faith and fair dealing, Aegis deliberately conducted its affairs in a manner which is intended or designed to prevent the conditions to closing from being satisfied, thereby delaying and eventually thwarting the closing.

36.    Aegis thereby breached both its express contractual obligation as set forth in Section 6.04 of the Merger Agreement and the duty of good faith and fair dealing.

37.    Aegis' breach of the duty of good faith and fair dealing has caused and threatens to cause Plaintiffs continuing irreparable harm and/or substantial damages.

38.    Plaintiffs have no adequate remedy at law.

## COUNT III
### (BREACH OF CONTRACT: EXCLUSIVITY)

39.    Plaintiffs repeat and reallege each and every allegation made in paragraphs 1 through 38 as if set forth fully herein.

40.    The Merger Agreement in Section 5.03 (a) provides that Aegis and its representatives may not "initiate, take any action to facilitate, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other person relating to the acquisition by such other person of [Aegis]."

41.    The sole exception to the aforementioned non-solicitation provision is found in Section 5.03(b), which provides that, "if there has been no breach of Section 5.03(a)," Aegis and its board may (a) "enter into discussions or negotiations with any person in response to an unsolicited bona fide written acquisition proposal (an 'Acquisition Proposal') . . ." and (b) agree to, approve or recommend such an Acquisition Proposal in certain circumstances. (Emphasis added.)

42.    Thus, if Aegis has breached Section 5.03(a) by initiating, facilitating or otherwise encouraging proposals other than the AllServe transaction, Aegis thereafter has no right to enter into discussions with third parties or to accept any third party proposals.

43.    Upon information and belief, after the signing of the Merger Agreement, Aegis, and/or its representatives, in breach of their contractual obligations, solicited or actively pursued alternative transactions with acquirers and/or investors other than Plaintiffs, including the Deutsche Bank/Essar Transaction. As such, Aegis had no right to enter into discussions or negotiations, with respect to the Deutsche Bank/Essar Transaction, nor to agree to approve or recommend such transaction.

44.     The breach of the Merger Agreement caused by the breach of the non-solicitation clause thwarted Plaintiffs' efforts to close the Merger and resulted in Plaintiffs' loss of the opportunity to acquire Aegis.

45.     Upon information and belief, this affirmative proposal was the reason for Aegis' delay of the closing and ultimate purported termination of the Merger Agreement.

46.     Aegis' breach of the non-solicitation clause in the Merger Agreement has caused and threatens to cause Plaintiffs continuing irreparable harm and/or substantial damages.

47.     Plaintiffs have no adequate remedy at law.

## COUNT IV
### (BREACH OF CONTRACT:  IMPROPER TERMINATION)

48.     Plaintiffs repeat and reallege each and every allegation made in paragraphs 1 through 47 as if set forth fully herein.

49.     As set forth above, on information and belief, Aegis and/or its representatives solicited the Deutsche Bank/Essar Transaction.

50.     Accordingly, that transaction cannot be an "unsolicited bona fide acquisition proposal" as defined in Section 5.03(b) of the Merger Agreement.

51.     Moreover, the definition of "Superior Proposal" under the Merger Agreement incorporates the requirement that any such proposal be an "unsolicited bona fide acquisition proposal."  Therefore the offer from Deutsche Bank and Essar is not a Superior Proposal as defined in the Merger Agreement.

52.     Accordingly, Aegis had no right to terminate the Merger Agreement pursuant to Section 9.01(j) of the Merger Agreement, which provided that Aegis could terminate if the Board decided to accept a "Superior Proposal".

53.    Aegis' breach of the termination clause in the Merger Agreement has caused and threatens to cause Plaintiffs continuing irreparable harm and/or substantial damages.

54.    Plaintiffs have no adequate remedy at law.

**COUNT V**
**(BREACH OF CONTRACT: BREAK-UP FEE)**

55.    Plaintiffs repeat and reallege each and every allegation made in paragraphs 1 through 54 as if set forth fully herein.

56.    By letter dated November 5, 2003, Aegis notified Plaintiffs that Aegis purported to terminate the Merger Agreement pursuant to Section 9.01(j) of the Merger Agreement (the "Superior Proposal Provision").

57.    The Merger Agreement provides in Section 9.02(c) that, if the Merger Agreement is terminated by Aegis pursuant to Section 9.01(j), then Aegis must pay to Plaintiffs a Break-Up Fee in cash of $1,137,500. Section 9.02(c) further provides that such payment shall be made "by wire transfer of immediately available funds . . . within two business days after lawful demand by [AllServe]."

58.    By letter dated November 6, 2003, Plaintiffs demanded that Aegis pay the aforementioned Break-Up Fee.

59.    Plaintiffs have fully performed their obligations under the Merger Agreement and have not in any material regard breached the Merger Agreement.

60.    Aegis has not paid the Break-Up Fee within two business days as required by Section 9.02(b) and therefore has breached the Merger Agreement. To date, Aegis continues to refuse to pay the Break-Up Fee to AllServe. Accordingly, Aegis is in breach of the Merger Agreement.

61.     Further, pursuant to Section 5.03(b)(ii) of the Merger Agreement, Aegis may not enter into a transaction with a third party until and unless Aegis has paid the Break-Up Fee.  Because the Break-Up Fee remains unpaid, any purported alternative transactions, including the Deutsche Bank/Essar transaction, are void.

62.     The Merger Agreement provides also in Section 9.02(d) that Plaintiffs are entitled to their costs, including attorneys fees, incurred in connection with an action to collect the Break-Up Fee.

63.     Aegis' breach of the termination and Break-Up Fee clauses entitles AllServe to the Break-Up Fee of $1,137,500 as well as costs including attorneys fees incurred in connection with an action to collect the Break-Up Fee.

64.     Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.     Declaring that Aegis has breached the Merger Agreement by, *inter alia*, failing to close the Merger on or about October 24, 2003, breaching their duty of good faith and fair dealing, soliciting alternative proposals, improperly terminating the Merger Agreement and failing to pay the Break-Up Fee;

B.     Specifically enforcing the Merger Agreement (which remedy the parties agreed in the Merger Agreement was appropriate);

C.     Temporarily, preliminarily and permanently enjoining closing of the Deutsche Bank/Essar Transaction until such time as the Break-Up Fee has been paid and/or declaring the Deutsche Bank/Essar Transaction to be void;

D.     Granting Plaintiffs damages, which exceed Fifty Million dollars;

E.  Awarding Plaintiffs their costs, fees and expenses associated with this

action including, but not limited to, the costs of collecting the Break-Up

Fee as provided by Section 9.02(d) of the Merger Agreement; and

F.  Granting such other and further relief as the Court deems just and proper.

OF COUNSEL:

Joel B. Harris
Jonathan D. Forstot
THACHER PROFFITT & WOOD LLP
Two World Financial Center
New York, NY 10281
(212) 912-7400

Catherine G. Dearlove (#3328)
James H. McMackin, III (#4282)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
  Attorneys for Plaintiffs

Dated:  November 12, 2003

# Exhibit A

AGREEMENT AND PLAN OF MERGER

Dated as of July 11, 2003

By and Among

ALLSERVE SYSTEMS PLC

ALLSERVE SYSTEMS, INC.

and

AEGIS COMMUNICATIONS GROUP, INC.

# TABLE OF CONTENTS

Page No.

**ARTICLE I     THE MERGER** ........................................................................... 1

SECTION 1.01.     THE MERGER ....................................................................... 1
SECTION 1.02.     CLOSING; CLOSING DATE; EFFECTIVE TIME ........................ 1
SECTION 1.03.     EFFECT OF THE MERGER ..................................................... 2
SECTION 1.04.     CERTIFICATE OF INCORPORATION AND BYLAWS ................... 2
SECTION 1.05.     DIRECTORS AND OFFICERS .................................................. 2

**ARTICLE II     MERGER CONSIDERATION AND CONVERSION AND
EXCHANGE OF SECURITIES** .................................................. 3

SECTION 2.01.     MERGER CONSIDERATION ..................................................... 3
SECTION 2.02.     CONVERSION OR CANCELLATION OF CAPITAL STOCK ........... 4
SECTION 2.03.     PAYMENT AND ESCROW PROCEDURES .................................. 5
SECTION 2.04.     DISSENTERS' SHARES ........................................................... 6

**ARTICLE III     REPRESENTATIONS AND WARRANTIES OF THE COMPANY** ......... 6

SECTION 3.01.     ORGANIZATION; QUALIFICATION AND CORPORATE POWER;
SUBSIDIARIES ..................................................................... 6
SECTION 3.02.     AUTHORITY; NO CONFLICT; REQUIRED FILINGS AND CONSENTS ....... 7
SECTION 3.03.     DEBT AND CAPITALIZATION ................................................. 8
SECTION 3.04.     SEC FILINGS; FINANCIAL STATEMENTS ............................... 10
SECTION 3.05.     PROPERTIES; ENCUMBRANCES ........................................... 11
SECTION 3.06.     ABSENCE OF CERTAIN CHANGES OR EVENTS ...................... 12
SECTION 3.07.     NO UNDISCLOSED LIABILITIES ........................................... 12
SECTION 3.08.     ABSENCE OF LITIGATION ................................................... 13
SECTION 3.09.     EMPLOYEE BENEFIT PLANS; LABOR MATTERS ..................... 13
SECTION 3.10.     TAXES ............................................................................... 15
SECTION 3.11.     ENVIRONMENTAL MATTERS ................................................ 16
SECTION 3.12.     BROKERS ........................................................................... 17
SECTION 3.13.     MATERIAL CONTRACTS ...................................................... 17
SECTION 3.14.     PRINCIPAL CUSTOMERS AND SUPPLIERS ............................ 18
SECTION 3.15.     INTELLECTUAL PROPERTY .................................................. 18
SECTION 3.16.     INTENTIONALLY DELETED .................................................. 19
SECTION 3.17.     STATE TAKEOVER LAWS ..................................................... 19
SECTION 3.18.     BOOKS AND RECORDS ........................................................ 19
SECTION 3.19.     CORPORATE DOCUMENTS .................................................. 19
SECTION 3.20     INSURANCE ........................................................................ 19
SECTION 3.21     LABOR .............................................................................. 19
SECTION 3.22.     DISCLOSURE ...................................................................... 20
SECTION 3.23.     INDEMNIFICATION ............................................................. 20
SECTION 3.24.     REGISTRATION RIGHTS ...................................................... 20

**ARTICLE IV     REPRESENTATIONS AND WARRANTIES OF BUYER AND
MERGER SUB** ....................................................................... 20

SECTION 4.01.    ORGANIZATION; QUALIFICATION AND CORPORATE POWER........................... 20
SECTION 4.02.    AUTHORITY; NO CONFLICT; REQUIRED FILINGS AND CONSENTS ................... 21
SECTION 4.03.    VOTE REQUIRED ................................................................................ 22
SECTION 4.04.    BROKERS ......................................................................................... 22
SECTION 4.05.    FUNDING .......................................................................................... 22

ARTICLE V    COVENANTS ............................................................................................ 22

SECTION 5.01.    COVENANTS OF THE COMPANY ........................................................... 22
SECTION 5.02.    COOPERATION ................................................................................... 22
SECTION 5.03.    EXCLUSIVITY .................................................................................... 24
SECTION 5.04.    ACCESS AND INFORMATION................................................................. 25
SECTION 5.05.    PUBLIC ANNOUNCEMENTS.................................................................. 26
SECTION 5.06.    EMPLOYEE BENEFITS ......................................................................... 26
SECTION 5.07.    EMPLOYMENT AGREEMENTS ............................................................... 26
SECTION 5.08.    DEREGISTRATION OF THE COMPANY .................................................... 28
SECTION 5.09.    LEGAL CONDITIONS TO MERGER........................................................... 28
SECTION 5.10.    CONSENTS........................................................................................ 28
SECTION 5.11.    EFFORTS TO CONSUMMATE ................................................................ 29

ARTICLE VI    ADDITIONAL AGREEMENTS ...................................................................... 29

SECTION 6.01.    MEETING OF STOCKHOLDERS ............................................................. 29
SECTION 6.02.    PREPARATION OF PROXY STATEMENT.................................................... 29
SECTION 6.03.    INDEMNIFICATION OF OFFICERS AND DIRECTORS OF THE COMPANY ............. 30
SECTION 6.04.    ADDITIONAL AGREEMENTS ................................................................. 31
SECTION 6.05.    CORPORATE OPTION CANCELLATION TRANSACTION ................................. 31
SECTION 6.06.    JUDICIAL RELIEF............................................................................... 31
SECTION 6.07.    ATC TRANSACTION............................................................................ 31
SECTION 6.08.    UPDATE OF COMPANY DISCLOSURE LETTER ........................................... 32
SECTION 6.09.    NOTIFICATION OF CERTAIN MATTERS ................................................... 32
SECTION 6.10.    BDO OPINION AND SIDE LETTER.......................................................... 32

ARTICLE VII    CLOSING CONDITIONS .......................................................................... 33

SECTION 7.01.    CONDITIONS TO OBLIGATIONS OF EACH PARTY UNDER THIS
                 AGREEMENT.................................................................................... 33
SECTION 7.02.    ADDITIONAL CONDITIONS TO OBLIGATIONS OF BUYER AND MERGER SUB ....... 33
SECTION 7.03.    ADDITIONAL CONDITIONS TO OBLIGATIONS OF THE COMPANY ................... 35

ARTICLE VIII    INDEMNIFICATION ............................................................................... 36

SECTION 8.01.    SURVIVAL........................................................................................ 36
SECTION 8.02.    INDEMNIFICATION BY THE ESCROWING PARTIES .................................... 36
SECTION 8.03.    PROCEDURES RELATING TO INDEMNIFICATION ...................................... 37
SECTION 8.04.    TAX MATTERS................................................................................... 38
SECTION 8.05.    CHARACTERIZATION OF INDEMNIFICATION PAYMENTS............................. 39
SECTION 8.06.    EXCLUSIVE REMEDY.......................................................................... 39

ARTICLE IX    TERMINATION........................................................................................ 39

SECTION 9.01.    TERMINATION................................................................................... 39

007157.00066:782833.012

SECTION 9.02.   EFFECT OF TERMINATION................................................................. 40
SECTION 9.03.   FEES AND EXPENSES .................................................................... 42

**ARTICLE X       GENERAL PROVISIONS**............................................................. 42

SECTION 10.01.   NOTICES ...................................................................................... 42
SECTION 10.02.   CERTAIN DEFINITIONS.................................................................. 43
SECTION 10.03.   HEADINGS AND TABLE OF CONTENTS.......................................... 44
SECTION 10.04.   SEVERABILITY............................................................................... 44
SECTION 10.05.   ENTIRE AGREEMENT..................................................................... 44
SECTION 10.06.   ASSIGNMENT, BINDING EFFECT .................................................. 44
SECTION 10.07.   INTERPRETATION........................................................................... 45
SECTION 10.08.   SPECIFIC PERFORMANCE.............................................................. 45
SECTION 10.09.   AMENDMENT................................................................................. 45
SECTION 10.10.   WAIVER......................................................................................... 45
SECTION 10.11.   GOVERNING LAW.......................................................................... 45
SECTION 10.12.   COUNTERPARTS............................................................................ 45

**EXHIBITS:**

| Exhibit A | Certificate of Merger |
| Exhibit B | Flow of Funds Statement |
| Exhibit C | Payment and Escrow Agreement |
| Exhibit D | Fairness Opinion |
| Exhibit E | Form of Opinion of Counsel to the Company |
| Exhibit F | Form of Voting Agreement |
| Exhibits G1-G4 | Forms of Employment Agreements |

**SCHEDULES:**

Company Disclosure Letter
Buyer Disclosure Letter

007157.00066:782833.012

EXECUTION COPY

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of July 11, 2003 (this "Agreement"), is by and among AllServe Systems PLC, a UK corporation ("Buyer"), AllServe Systems, Inc., a Delaware corporation and wholly-owned subsidiary of Buyer ("Merger Sub"), and Aegis Communications Group, Inc., a Delaware corporation (the "Company").

WHEREAS, the Boards of Directors of Buyer, Merger Sub and the Company deem it advisable and in the best interests of, respectively, each corporation and its stockholders that Buyer and the Company engage in a business combination in order to advance the long-term business interests of Buyer and the Company, respectively;

WHEREAS, in furtherance of the foregoing, the Boards of Directors of Buyer, Merger Sub and the Company have approved a business combination by means of a merger of Merger Sub with and into the Company, as a result of which the Company will become a wholly-owned subsidiary of Buyer (the "Merger"), pursuant to the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Board of Directors of the Company has recommended that the Company's stockholders adopt this Agreement and approve the Merger.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, the parties hereto agree as follows:

## ARTICLE I

## THE MERGER

SECTION 1.01.    *The Merger.*  Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time (defined in Section 1.02), Merger Sub will merge with and into the Company in accordance with the General Corporation Law of the State of Delaware ("Delaware Law").  As a result of the Merger, the separate corporate existence of Merger Sub will cease and the Company will continue as the surviving corporation of the Merger (the "Surviving Corporation").  Certain terms used in this Agreement are defined in Section 10.02.

SECTION 1.02.    *Closing; Closing Date; Effective Time.* Unless this Agreement has been terminated pursuant to Section 9.01, and subject to the satisfaction or waiver of the conditions set forth in Article VII, the consummation of the Merger and the closing of the transactions contemplated by this Agreement (the "Closing") will take place as of the close of business on the third business day after the satisfaction or waiver of the conditions set forth in Article VII at the New York City offices of Thacher Proffitt & Wood, or at such other date, time and place as Buyer and the Company may agree; provided, that the Closing will take place no

007157.00066:782833.012

later than September 30, 2003 (with the understanding that each party will use all commercially reasonable efforts to effect the Closing by August 31, 2003) (the "Closing Deadline"), except that the Closing Deadline will be extended by one day, but in no event beyond November 30, 2003 (provided that the Closing Deadline will not be extended beyond October 31, 2003, and either party may terminate this Agreement pursuant to Section 9.01(g), if the only condition remaining to be satisfied on October 31, 2003 is the termination or release of options or warrants to purchase capital stock of the Company or one of its subsidiaries), for each day (a) the Proxy Statement (defined in Section 6.02) is under review by the Securities and Exchange Commission (the "SEC"), or (b) the consummation of the Merger and the closing of the transactions contemplated hereby is delayed for other (non-SEC) regulatory reasons, external (e.g., not instituted by any of the parties) legal actions or proceedings related solely to the Merger or the transactions contemplated hereby, legal actions or proceedings by the parties related to the Judicial Relief, or other reasons beyond the parties' reasonable control. The date on which the Closing takes place is referred to herein as the "Closing Date." As promptly as practicable on the Closing Date, (i) the Company will deliver to Buyer and Merger Sub any certificates, instruments, and documents required to be delivered on or prior to the Closing Date pursuant to Section 7.02, (ii) Buyer and Merger Sub will deliver to the Company any certificates, instruments, and documents required to be delivered on or prior to the Closing Date pursuant to Section 7.03, and (iii) the Company and Merger Sub will file with the Secretary of State of the State of Delaware ("Secretary of State") a Certificate of Merger in the form attached hereto as Exhibit A (the "Certificate of Merger").

SECTION 1.03.    *Effect of the Merger*. At the time the Certificate of Merger is filed with the Secretary of State (the "Effective Time"), the effect of the Merger will be as provided in the applicable provisions of Delaware Law.

SECTION 1.04.    *Certificate of Incorporation and Bylaws*. At the Effective Time, the certificate of incorporation and bylaws of Merger Sub in effect immediately prior to the Effective Time will be the certificate of incorporation and bylaws of the Surviving Corporation and thereafter will continue to be its certificate of incorporation and bylaws in each case until amended as provided therein and pursuant to Delaware Law.

SECTION 1.05.    *Directors and Officers*.    The directors of Merger Sub will be the directors of the Surviving Corporation at the Effective Time, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation, in each case until their respective successors are duly elected or appointed and qualified. The officers of Merger Sub immediately prior to the Effective Time will be the officers of the Surviving Corporation at the Effective Time, each to hold office in accordance with the bylaws of the Surviving Corporation, in each case until their respective successors are duly elected or appointed and qualified.

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

# ARTICLE II

# MERGER CONSIDERATION AND CONVERSION AND EXCHANGE OF SECURITIES

SECTION 2.01.    *Merger Consideration.*

(a)    The aggregate cash consideration (the "Cash Consideration") will be an amount in cash equal to **$22,750,000**.  The Cash Consideration will be allocated as follows, in amounts set forth in the flow of funds statement attached hereto as <u>Exhibit B</u> (the "Flow of Funds Statement"):  (i) to the Bank Debt (defined below); (ii) to the Retention Bonuses (defined in <u>Section 5.06(d)</u>); (iii) to the Deal Expenses (defined below); (iv) to the Subordinated Debt (defined below), (A) a portion of which is to be paid in connection with the Closing (the "Paid Subordinated Debt") and (B) a portion of which is to be held in escrow as specified herein (the "Escrow Fund"); and (v) to the holders of Series B Preferred Stock of the Company (the "Series B Fund").  For purposes of this Agreement, "Bank Debt" means an amount sufficient to extinguish all obligations of the Company and its subsidiaries under the Fourth Amended and Restated Credit Agreement, dated April 14, 2003, among IQI, Inc., the Company (as a guarantor), and various financial institutions, with the Bank of Nova Scotia as documentation agent and administrative agent and Credit Suisse First Boston as a syndication agent (not including any indebtedness for letters of credit issued under this facility, for which Buyer and the Company will be responsible), including but not limited to any pre-termination or other fees or penalties imposed by the above-referenced financial institutions, and secure appropriate releases thereunder.  "Deal Expenses" means the investment banking fees and expenses referenced in <u>Section 3.12</u>, the Company's legal fees and expenses (including those related to (x) obtaining, if necessary, the Judicial Relief described in <u>Section 6.06</u> relating to the Series B Preferred Stock (as defined in <u>Section 2.01(b)</u>), (y) completing, if necessary, the Corporate Option Cancellation Transaction described in <u>Section 6.05</u>, and (z) completing the ATC Transaction (as defined in <u>Section 6.07</u>)), accounting fees and expenses (not including any fees or expenses payable to BDO (as defined in <u>Section 3.04(d)</u>) related to the BDO Opinion and Side Letter described in <u>Section 6.10</u>), any costs or expenses relating to the Excluded Shares (defined in <u>Section 2.02(e)</u>), and other reasonable transaction-related fees and expenses relating to the Merger incurred by the Company prior to Closing, including all amounts already paid by the Company prior to Closing, all of which are listed or will be listed on <u>Section 2.01(a)</u> of the Company Disclosure Letter (the "Prepaid Deal Expenses"), which Prepaid Deal Expenses will be refunded to the Company out of the Cash Consideration (provided that a $150,000 fee that was paid to SunTrust Robinson Humphrey Capital Markets, Inc. prior to the date hereof will not be considered to be a Prepaid Deal Expense and any fees paid to SunTrust Robinson Humphrey Capital Markets, Inc. prior to Closing relating to the Fairness Opinion (defined in <u>Section 3.04(e)</u>) will be considered to be Prepaid Deal Expenses.  "Subordinated Debt" means the amount set forth as such in the Flow of Funds Statement (subject to any subsequent adjustment required by the Court (defined in <u>Section 6.06</u>) in connection with the Judicial Relief, if necessary), which the Noteholders (defined below) have agreed, pursuant to Noteholder Agreements (defined in the Payment and Escrow Agreement, which is defined in <u>Section 2.03(a)</u>) will be sufficient to extinguish the Company's and its subsidiaries' obligations and secure releases under the following promissory notes:  (w) the Amended and Restated Promissory Note, dated April 11, 2003, in the original principal amount of $808,600, payable to the order of Edward Blank, (x) the Amended and

[TPW: NYLEGAL:156436.2] 19935-00000 06/26/2003 2:22 PM

007157.00066:782833.012

Restated Promissory Note, dated April 11, 2003, in the original principal amount of $191,400, payable to the order of the Edward Blank 1995 Grantor Retained Trust, (y) the Amended and Restated Promissory Note, dated April 11, 2003, in the original principal amount of $4,212,236, payable to the order of Thayer Equity Investors III, L.P., and (z) the Amended and Restated Promissory Note, dated April 11, 2003, in the original principal amount of $9,194,844, payable to the order of Thayer Equity Investors III, L.P. "Noteholders," as used herein, means Edward Blank, the Edward Blank 1995 Grantor Retained Trust and Thayer Equity Investors III, L.P.

(b)     The holders of the Company's Series B Preferred Stock, $.01 par value per share ("Series B Preferred Stock"), will be entitled to receive, pro rata in accordance with their ownership of shares of Series B Preferred Stock, the Series B Fund, in consideration for which each such holder will execute and deliver a release to the Company of any claims against the Company, whether or not related to shares of Series B Preferred Stock owned by such holder, and each share of Series B Preferred Stock will no longer be outstanding and will automatically be cancelled and retired and will cease to exist, subject to any adjustment required by the Court in connection with the Judicial Relief, if necessary.

(c)     No holder of any other class or series of capital stock of the Company, including Series D Preferred Stock, par value $.01 per share ("Series D Preferred Stock"), Series E Preferred Stock, par value $.01 per share ("Series E Preferred Stock"), Series F Preferred Stock, par value $.01 per share ("Series F Preferred Stock"), and common stock, par value $.01 per share ("Company Common Stock") will be entitled to receive any Cash Consideration or other consideration in respect of such shares.

SECTION 2.02.     *Conversion or Cancellation of Capital Stock.*  As of the Effective Time, by virtue of the Merger and without any action on the part of any holder of capital stock of the Company or Merger Sub:

(a)     Capital Stock of Merger Sub.  Each issued and outstanding share of common stock, par value $.01 per share, of Merger Sub will be converted into and become 521,711.68 fully paid and nonassessable shares of common stock, par value $.01 per share, of the Surviving Corporation.

(b)     Cancellation of Treasury Stock.  All shares of Company Common Stock that are owned by the Company as treasury stock will be cancelled and retired and will cease to exist and no consideration will be delivered in exchange therefor.

(c)     Series B Preferred Stock.  Each issued and outstanding share of Series B Preferred Stock will be cancelled and retired in accordance with Section 2.01(b) and Section 2.03(c).

(d)     All Other Series of Preferred Stock.  Each issued and outstanding share of Series D Preferred Stock, Series E Preferred Stock and Series F Preferred Stock will be cancelled and retired and will cease to exist, and no consideration will be delivered in exchange therefor.

(e)     Company Common Stock.  Each issued and outstanding share of Company Common Stock will be cancelled at the Effective Time, other than (i) shares of Company Common Stock the holder of which (the "Dissenting Stockholder"), pursuant to any

[TPW: NYLEGAL:156436.2] 19935-00000 06/26/2003 2:22 PM

007157.00066:782833.012

applicable law providing for dissenters' or appraisal rights, is entitled to receive payment in accordance with the provisions of any such law, such holder to have only the rights provided in any such law (the "Dissenters' Shares"); and (ii) shares of Company Common Stock held directly or indirectly by Buyer (other than (A) shares held in a fiduciary capacity or (B) shares held in satisfaction of a debt previously contracted). The shares referred to in clauses (i) and (ii) above are hereinafter collectively referred to as the "Excluded Shares"). All shares of Company Common Stock other than Excluded Shares, when cancelled in accordance with this Section 2.02(e), will no longer be outstanding and will automatically be retired and will cease to exist, and each holder of a certificate representing any such shares will cease to have any rights with respect thereto. All Excluded Shares, other than Dissenters' Shares, will no longer be outstanding and will automatically be cancelled and retired and will cease to exist and no exchange or payment will be made with respect thereto.

SECTION 2.03.        *Payment and Escrow Procedures.*

(a)        Payment and Escrow Agreement; Deposit of Cash Consideration. At the Closing, Buyer, the Escrowing Parties (defined in Section 8.02(a)), the Representative (defined in the Payment and Escrow Agreement) and Key Bank, N.A., or another financial institution chosen by Buyer and consented to by the Company, which consent will not be unreasonably withheld (the "Agent"), will enter into a Payment and Escrow Agreement in substantially the form of Exhibit C hereto, with such changes as may reasonably be requested by the Agent (the "Payment and Escrow Agreement"). As of the Effective Time, Buyer will deposit the Cash Consideration with the Agent, and the Agent will distribute or hold the Cash Consideration for distribution, in accordance with this Section 2.03 (in the order of priority set forth below), and in accordance with the Payment and Escrow Agreement and the Flow of Funds Statement. The Escrow Fund will be held by the Agent to secure claims for indemnification made pursuant to Article VIII hereof.

(b)        Payment Procedure for the Bank Debt. At or as soon as reasonably practicable after the Effective Time, the Agent will pay an amount in cash equal to the Bank Debt to the holders of the Bank Debt.

(c)        Payment Procedure for the Retention Bonuses. At or as soon as reasonably practicable after the Effective Time, the Agent will pay an amount in cash equal to payments due under the Retention Bonuses to the holders of the Retention Bonuses.

(d)        Payment Procedure for the Deal Expenses. At or as soon as reasonably practicable after the Effective Time, the Agent will pay an amount in cash equal to payments due under the Deal Expenses to the persons specified to receive such payments in the Flow of Funds Statement, and will pay the amount of the Prepaid Deal Expenses to the Company.

(e)        Payment Procedure for the Paid Subordinated Debt. At or as soon as reasonably practicable after the Effective Time, the Agent will pay to each Noteholder its pro rata share in cash of the Paid Subordinated Debt, as set forth in the Flow of Funds Statement. The Agent will hold the portion of the payments on the Subordinated Debt that makes up the Escrow Fund pursuant to Article VIII hereof and the Payment and Escrow Agreement.

[TPW: NYLEGAL:156436.2] 19935-00000 06/26/2003 2:22 PM

007157.00066:782833.012

(f)     <u>Payment Procedure for the Series B Preferred Stock</u>.  At or as soon as reasonably practicable after the Effective Time, the Agent will pay to each holder of Series B Preferred Stock the per-share cash consideration to which it is entitled out of the Series B Fund, as set forth in the Flow of Funds Statement or as the Company may be directed in connection with the Judicial Relief, if necessary.

(g)     <u>No Other Payments</u>.  The Agent will not make any payments of Cash Consideration to holders of Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock or Company Common Stock.

(h)     <u>Closing of Stock Transfer Books</u>.  From and after the Effective Time, the stock transfer books of the Company will be closed and thereafter there will be no further registration of transfers on the stock transfer books of the Company or the Surviving Corporation of the shares of Company Common Stock that were outstanding immediately prior to the Effective Time.  If, after the Effective Time, certificates representing shares of Company Common Stock or any series of Preferred Stock are presented to the Surviving Corporation for any reason, they will be cancelled and exchanged as provided in this Agreement.

(i)     <u>No Liability</u>.  Neither Buyer nor the Company will be liable to any holder of shares of capital stock of the Company in respect of any monies properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

SECTION 2.04.     *Dissenters' Shares*.  Notwithstanding any other provision of this Agreement to the contrary, Dissenters' Shares outstanding immediately prior to the Effective Time that are held by Dissenting Stockholders who have not voted in favor of the Merger and who have properly demanded in writing appraisal for such shares in accordance with Section 262 of Delaware Law and who have not withdrawn such demand or otherwise forfeited appraisal rights will not be cancelled at the Effective Time.  Such Dissenting Stockholders will be entitled to receive payment of the appraised value of such Dissenters' Shares held by them in accordance with the provisions of Section 262 of Delaware Law, except that all shares of Company Common Stock held by persons ("Common Stockholders") who have failed to perfect or who have effectively withdrawn or lost their rights to appraisal of such shares of Company Common Stock under Section 262 of Delaware Law will thereupon be deemed to have been cancelled as of the Effective Time.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Buyer and Merger Sub that the statements contained in this <u>Article III</u> are true and correct as of the date hereof and at the Effective Time (unless the particular statement is, by its language, as of another date, in which case, it is true and correct as of that other date), except as set forth in the disclosure letter delivered by the Company to Buyer on or before the date of this Agreement (the "Company Disclosure Letter"):

SECTION 3.01.     *Organization; Qualification and Corporate Power; Subsidiaries.* Each of the Company and its subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, has all requisite corporate

power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and is qualified to do business in the jurisdictions listed in <u>Section 3.01</u> of the Company Disclosure Letter. Each of the Company and its subsidiaries is duly qualified and in good standing to do business in each jurisdiction in which the nature of the business conducted by it or the ownership or leasing of its properties makes such qualification necessary, other than where the failure to be so duly qualified and in good standing would not have a Company Material Adverse Effect. The term "Company Material Adverse Effect" as used in this Agreement means any change or effect that, individually or when taken together with all other such changes or effects, (a) would be materially adverse to the assets, financial condition or results of operations of the Company and its subsidiaries, taken as a whole; (b) materially and adversely affects the ability of the Company, as the context may dictate, to perform its material obligations hereunder; or (c) materially and adversely affects the timely consummation of the transactions contemplated hereby; provided, that none of the following will be deemed in and of themselves to constitute, and none of the following will be taken into account in determining whether there has been, a Company Material Adverse Effect: (i) any adverse change, event, development or offset arising from or relating to (A) general business or economic conditions or (B) general business or economic conditions relating to any industries in which the Company or any of its subsidiaries participates, in each case which is not specific to the Company and its subsidiaries (including but not limited to any changes in regulation of the telemarketing/telephone solicitation industry, such as "do not call lists" or otherwise, in any jurisdiction in which the Company operates), or (ii) any adverse change, event, development or effect arising from or relating to any change in U.S. generally accepted accounting principles. The ownership of each of the Company's subsidiaries is set forth in <u>Section 3.01</u> of the Company Disclosure Letter and, at Closing, each such subsidiary will be wholly-owned by the Company.

SECTION 3.02.    *Authority; No Conflict; Required Filings and Consents.*

(a)    The Company has all requisite corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement by the Company and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company, subject only to the Merger Vote specified in <u>Section 3.02(b)</u>. This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as may be limited by bankruptcy, insolvency or other laws affecting the rights of creditors generally.

(b)    The affirmative votes of (i) the holders of a majority of (A) the outstanding shares of Company Common Stock and (B) the outstanding shares of Series F Preferred Stock (of which each share will entitle the holder to cast a number of votes equal to the number of votes such holder would be entitled to cast had such holder converted such Series F Preferred Shares into shares of Company Common Stock), (ii) the holders of a majority of the Series B Preferred Stock, and (iii) the holders of a majority of the Series D Preferred Stock and the Series E Preferred Stock, voting together as a class, are the only actions by the holders of capital stock of the Company necessary to adopt this Agreement and approve the Merger (together, the "Merger Vote"). The Board of Directors of the Company (at a meeting duly called and held) has (x) approved this Agreement, the Merger and the transactions contemplated hereby

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

(the "Merger Proposal"), (y) determined that the Merger Proposal is in the best interests of the holders of capital stock of the Company (collectively, the "Stockholders") and declared the advisability of this Agreement, and (z) recommended that the Stockholders vote in favor of the Merger Proposal.

(c)     The execution and delivery of this Agreement by the Company does not, and the consummation by the Company of the transactions contemplated by this Agreement will not, (i) conflict with, or result in any violation or breach of any provision of the Company's Certificate of Incorporation or Bylaws or the charter or bylaws of any subsidiary of the Company (copies of each of which have been provided to Buyer, each as amended and in full force and effect as of the date of this Agreement), (ii) result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit), or result in the creation of any lien, pledge, security interest, charge or other encumbrance upon any of the properties or assets of the Company or under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, contract or other agreement, instrument or obligation to which the Company or any of its subsidiaries is a party or by which any of them or any of their properties or assets may be bound except for violations, breaches, defaults, terminations, cancellations, accelerations or losses which would not, in the aggregate, reasonably be expected to have a Company Material Adverse Effect, or (iii) constitute a breach or violation of, or default under, any law, including any Environmental Law (as defined in Section 3.11(b)), permit, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to the Company or any of its subsidiaries or any of its or their properties or assets or enable any person to enjoin the Merger or the other transactions contemplated hereby.

(d)     No consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any court, administrative agency or commission or other governmental authority or instrumentality ("Governmental Entity") or other person is required to be obtained by, or given to or with respect to the Company or any of its subsidiaries in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) the Merger Vote, (ii) the filing of the Certificate of Merger with, and the acceptance of such filing by, the Secretary of State and (iii) the material third-party notices and consents identified in Section 3.02(d) of the Company Disclosure Letter (the notices and consents identified in clause (iii) hereof are collectively the "Company Third Party Consents").

SECTION 3.03.     *Debt and Capitalization.*

(a)     Except for the Bank Debt, the Subordinated Debt and the capitalized leases, letters of credit and other ordinary course debt previously disclosed to Buyer or disclosed in the Company Disclosure Letter, the Company has no long-term debt.

(b)     The authorized capital stock of the Company consists of (i) 200,000,000 shares of Company Common Stock, and (ii) 2,000,000 shares of Preferred Stock. As of July 7, 2003, 52,171,168 shares of Company Common Stock were issued and outstanding (not including 475,600 shares that were held in the Company's treasury), and the following shares of Preferred Stock were issued and outstanding: (A) 29,778 shares of Series B Preferred Stock, (B) 139,229

Page 8

shares of Series D Preferred Stock, (C) 79,283 shares of Series E Preferred Stock, and (D) 46,750 shares of Series F Preferred Stock. Except as set forth in <u>Section 3.03(b)</u> of the Company Disclosure Letter, each of the record owners of all shares of Company Common Stock and Preferred Stock are set forth in <u>Section 3.03(b)</u> of the Company Disclosure Letter and each of the outstanding shares of capital stock of the Company and its subsidiaries is duly authorized, validly issued, fully paid and nonassessable, and has not been issued in violation of (nor are any of the authorized shares of capital stock of the Company subject to) any preemptive or similar rights created by statute, the charter or bylaws of the Company, or any agreement to which the Company is a party or bound. Except as set forth in <u>Section 3.03(b)</u> of the Company Disclosure Letter, the outstanding shares of capital stock of the subsidiaries of the Company are owned, of record and beneficially, by the Company or another subsidiary of the Company, free and clear of all security interests, liens, pledges or charges. Other than certain of the Subordinated Debt (if such Subordinated Debt is converted into capital stock of the Company in accordance with its terms), no bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the Stockholders may vote are issued or outstanding.

(c)     Except as set forth in <u>Section 3.03(c)</u> of the Company Disclosure Letter, there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character (including stock appreciation rights, phantom stock or similar rights, arrangements, or commitments) to which the Company or any of its subsidiaries is a party relating to the issued or unissued capital stock of the Company or any of its subsidiaries or obligating the Company or any of its subsidiaries to grant, issue or sell any shares of the capital stock of the Company or any of its subsidiaries by sale, lease, license or otherwise. All items listed in <u>Section 3.03(c)</u> of the Company Disclosure Letter will be cancelled, terminated or released by the Effective Time such that no liability will continue to the Buyer, the Merger Sub or the Surviving Corporation. There are no material obligations, contingent or otherwise, of the Company or any of its subsidiaries to (i) repurchase, redeem or otherwise acquire any shares of the capital stock of the Company or any of its subsidiaries or (ii) provide funds to, or make any investment in (in the form of a loan, capital contribution or otherwise), or provide any guarantee with respect to the obligations of, any other person, other than advances to subsidiaries in the normal course of business. Except as described in the Company Disclosure Letter, neither the Company nor any of its subsidiaries (x) directly or indirectly owns, (y) has agreed to purchase or otherwise acquire or (z) holds any interest convertible into or exchangeable or exercisable for, any material amount of capital stock (or equivalent equity interest) of any person (other than direct or indirect wholly-owned subsidiaries of the Company). There are no material agreements, arrangements or commitments of any character (contingent or otherwise) pursuant to which any person is or may be entitled to receive any payment based on the revenues or earnings, or calculated in accordance therewith, of the Company or any of its subsidiaries. Except as described in the Company Disclosure Letter (and as will be terminated as of the Effective Time), there are no shareholder agreements, voting trusts, proxies or other material agreements or understandings to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound with respect to the voting of any shares of capital stock of the Company or any of its subsidiaries.

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

SECTION 3.04.    *SEC Filings; Financial Statements.*

(a)    The Company has filed with the SEC all forms, reports, statements and documents required to be filed by it pursuant to the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act"), and the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), in each case together with all amendments thereto, and will file all such forms, reports, statements and documents required to be filed by it prior to the Effective Time (collectively, the "Company Reports"), and has otherwise complied in all material respects with the requirements of the Securities Act and the Exchange Act.

(b)    As of their respective dates, the Company Reports complied in all material respects with the Securities Act and the Exchange Act and did not and (in the case of Company Reports filed after the date of this Agreement) will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were or (in the case of Company Reports filed after the date of this Agreement) will be made, not misleading. None of the Company's subsidiaries is required to file any form, report or other document with the SEC. The Company has made available to Buyer true and complete copies of all amendments and modifications that have been filed by the Company with the SEC to all agreements, documents and other instruments that previously had been filed by the Company with the SEC and are currently in effect. The SEC has not initiated any proceeding or, to the Company's knowledge, investigation into the business or operations of the Company or any of its subsidiaries.

(c)    The Company has established and maintains disclosure controls and procedures as required by Rule 13a-15 under the Exchange Act. Within 90 days preceding the date of each applicable Company Report, the Company has conducted an evaluation under the supervision and with the participation of its management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of its disclosure controls and procedures, and has concluded that its disclosure controls and procedures are effective to ensure that information required to be disclosed in the Company Reports is recorded, processed, summarized and reported, within the periods specified in, and in accordance with the requirements of, the SEC's rules, regulations and forms. Based on such evaluations, (i) there were no significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or material weaknesses in internal controls and (ii) there was no fraud, whether or not material, that involved management or other employees of the Company or any of its subsidiaries who have a significant role in the Company's internal controls.

(d)    The Company has made available to the Buyer copies of (a) the consolidated balance sheets of the Company and its subsidiaries as of December 31 for the fiscal years 2000, 2001 and 2002, and (b) the related consolidated statements of income, changes in stockholders' equity and cash flows for the fiscal years 2000 through 2002, inclusive, as reported in the Annual Report of the Company on Form 10-K for the fiscal year ended December 31, 2002 filed with the SEC under the Exchange Act, accompanied by the audit report of PriceWaterhouseCoopers, independent public accountants for the Company for the year ended December 31, 2000, the audit reports of BDO Seidman ("BDO"), independent public

Page 10

accountants for the Company for the years ended December 31, 2001 and December 31, 2002. The December 31, 2002 consolidated balance sheets of the Company (including the related notes, where applicable, the "Company Balance Sheets") and the other financial statements referred to herein (including the related notes, where applicable) fairly present, and the financial statements to be included in any reports or statements (including reports on Forms 10-Q and 10-K) to be filed by the Company with the SEC after the date hereof will fairly present, in all material respects, the consolidated financial position and results of the consolidated operations and cash flows and changes in stockholders' equity of the Company and its subsidiaries for the respective fiscal periods or as of the respective dates therein set forth; and each of such statements (including the related notes, where applicable) has been and will be prepared in accordance with GAAP, except as otherwise set forth in the notes thereto (subject, in the case of unaudited interim statements, to normal year-end adjustments). Each of the consolidated financial statements of the Company and its subsidiaries, including, in each case, the notes thereto, made available to the Buyer comply, and the financial statements to be filed with the SEC by the Company after the date hereof will comply, in all material respects, with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto. The books and records of the Company and its subsidiaries have been, and are being, maintained in accordance with GAAP and applicable legal and regulatory requirements.

(e)    The Company has received, and has provided Buyer and Merger Sub with a copy of, the opinion of SunTrust Robinson Humphrey Capital Markets, Inc., a copy of which is attached hereto as <u>Exhibit D</u>, to the effect that, as of the date of this Agreement, the Cash Consideration is fair, from a financial point of view, to the Stockholders (the "Fairness Opinion"), which Fairness Opinion has been reviewed and approved by the Board of Directors of the Company. Unaudited balance sheets as of May 31, 2003 for each of the subsidiaries of the Company have been provided to Buyer and Merger Sub prior to Closing and each such balance sheet fairly and accurately reflects in all material respects the assets and liabilities of such company on the date hereof.

SECTION 3.05.    *Properties; Encumbrances.* Except as set forth in <u>Section 3.05</u> of the Company Disclosure Letter, each of the Company and its subsidiaries has good, valid and legal title to or, in the case of leased properties and assets, a valid leasehold interest in, all the properties and assets which it purports to own or lease (real, personal and mixed, tangible and intangible), including, without limitation, all the properties and assets reflected in the Company's balance sheet as of March 31, 2003, which has been previously provided to Buyer (the "Company Balance Sheet"), except for personal property sold since the date of the Company Balance Sheet (the "Balance Sheet Date") in the ordinary course of business and consistent with past practices, and except where the failure to have such title or interest would not have a Company Material Adverse Effect. The Company Disclosure Letter includes a fixed tangible and intangible asset list for the Company and each subsidiary (the "Fixed Asset List"). All properties and assets reflected in the Company Balance Sheet and the Fixed Asset List are free and clear of all title defects or objections, liens, claims, charges, security interests or other encumbrances of any nature whatsoever, except for liens for current taxes not yet due, and except as would not have a Company Material Adverse Effect. To the Company's knowledge, all material tangible properties of the Company are in a good state of maintenance and repair (ordinary wear and tear excepted), conform in all material respects with all applicable

Page 11

ordinances, regulations and zoning laws and are considered by the Company to be adequate for the current business of the Company in all material respects.

SECTION 3.06.    *Absence of Certain Changes or Events.*  Except as disclosed in the Company Reports filed prior to the date of this Agreement or as set forth in the Company Disclosure Letter and except for the transactions contemplated hereby, from December 31, 2002 through the date hereof, the Company and its subsidiaries, taken as a whole, have conducted their businesses only in the ordinary course and in a manner consistent with past practice and there has not been: (a) any damage, destruction or loss (whether or not covered by insurance) with respect to any assets of the Company or any of its subsidiaries that has had or is reasonably likely to have a Company Material Adverse Effect; (b) any material change by the Company or any of its subsidiaries in their accounting methods, principles or practices (except as may be required by applicable Law or GAAP); (c) any declaration, setting aside or payment of any dividends or distributions in respect of shares of the capital stock of the Company or any of its subsidiaries or any redemption, purchase or other acquisition by the Company or any of its subsidiaries of any of their securities, except with respect to the Preferred Stock; (d) any split, combination or reclassification of any capital stock of the Company or any of its subsidiaries or any issuance or the authorization of any issuance of any other securities in respect of, in lieu of or in substitution for shares of capital stock of the Company or any of its subsidiaries; (e) any acquisition, divestiture, or investment in the equity or debt securities of any person (including in any joint venture or similar arrangement) material to the Company and its subsidiaries, taken as a whole; (f) any entry by the Company or any of its subsidiaries into any commitment or transaction material to the Company and its subsidiaries, taken as a whole, other than in the ordinary course of business and consistent with past practice; (g) except for periodic adjustments in keeping with past practice, any increase in or establishment of any bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, stock option (including, without limitation, the granting of stock options, stock appreciation rights, performance awards, or restricted stock awards), stock purchase or other employee benefit plan, or any other increase in the compensation payable or to become payable to any directors, officers or employees of the Company or any of its subsidiaries, or any grant of severance or termination pay, or any contract or arrangement entered into to make or grant any severance or termination pay, any payment of any bonus, or the taking of any action not in the ordinary course of business with respect to the compensation or employment of directors, officers or employees of the Company or any of its subsidiaries, (h) any material election made by the Company or any of its subsidiaries for federal or state income tax purposes, (i) any material acquisition or disposition of any assets or properties, or any contract for any such acquisition or disposition entered into, (j) any material lease of real or personal property entered into, other than in connection with foreclosed property or in the ordinary course of business consistent with past practice, or (k) any Company Material Adverse Effect.

SECTION 3.07.    *No Undisclosed Liabilities.*  As of the date hereof, except as and to the extent set forth in Section 3.07 of the Company Disclosure Letter, in the audited consolidated financial statements of the Company for the period ended as of December 31, 2002, in the condensed consolidated balance sheets of the Company as of December 31, 2002, 2001 and 2000 or in the Company Reports, neither the Company nor any of its subsidiaries has any material liabilities or obligations, absolute, accrued, contingent or otherwise, including, but not limited to

any material liabilities relating to any prior stock or asset sale or merger of the Company or its subsidiaries (collectively, "Liabilities").

SECTION 3.08.    *Absence of Litigation.*  Except as set forth in the Company Reports or in <u>Section 3.08</u> of the Company Disclosure Letter or as would not have a Company Material Adverse Effect, there is no claim, action, suit, litigation, proceeding, arbitration, investigation or audit of any kind, at law or in equity (including actions or proceedings seeking injunctive relief) ("Litigation"), pending or, to the Company's knowledge, threatened against the Company or any of its subsidiaries or any assets or rights of the Company or any of its subsidiaries and neither the Company nor any of its subsidiaries is subject to any material, continuing order of, consent decree, settlement agreement or other similar material written agreement with, or continuing investigation by, any Governmental Entity, or any material judgment, order, writ, injunction, decree or award of any Government Entity or arbitrator, including, without limitation, cease-and-desist or other orders.  All material litigation of the Company currently pending as of the date hereof is listed in <u>Section 3.08</u> of the Company Disclosure Letter, which list will be updated as of the Closing Date.

SECTION 3.09.    *Employee Benefit Plans; Labor Matters.*

(a)    Set forth in the Company Disclosure Letter is a complete and correct list of all employee benefit plans, arrangements or agreements, including, but not limited to, any employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), all plans or policies providing for "fringe benefits," all other bonus, incentive compensation, deferred compensation, profit sharing, severance, stock option, stock purchase, stock appreciation right, supplemental unemployment, layoff, consulting, or any other similar plan, agreement, policy or understanding, and any trust, escrow or other agreement related thereto, which provides benefits, or describes policies or procedures applicable, to any officer, employee, director, consultant, former officer or former director of the Company, any of its subsidiaries, or any other ERISA Affiliate, or any dependent or beneficiary thereof (each, a "Company Employee Plan," and collectively, the "Company Employee Plans").  The term "Company ERISA Affiliate" means any corporation, trade or business which together with the Company would be deemed to be a single employer under the provisions of ERISA or Section 414 of the Internal Revenue Code of 1986, as amended (the "Code").  Except as set forth in the Company Disclosure Letter or as otherwise contemplated pursuant to this Agreement, neither the Company nor any of its subsidiaries has communicated to any employee of the Company or any of its subsidiaries any intention or commitment to materially modify any Company Employee Plan or to establish or implement any other material benefit plan, program or arrangement.

(b)    With respect to each Company Employee Plan, the Company has made available to Buyer true, correct and complete copies of (i) the plan documents and summary plan descriptions and any amendments or modifications thereto other than for any plans that are Multiemployer Plans (defined below); (ii) the most recent determination letter, if applicable, received from the Internal Revenue Service (the "IRS") or a copy of or proof of filing of any pending applications with the IRS; (iii) the annual reports required to be filed for the plan years ended December 31, 2000 and December 31, 2001, including all attachments, exhibits and schedules thereto; (iv) the two most recent actuarial reports, if applicable; (v) all related trust

Page 13

agreements, insurance contracts or other funding agreements; and (vi) all other documents, records or other materials related thereto reasonably requested by Buyer.

(c)     Except as set forth in the Company Disclosure Letter, (i) each of the Company Employee Plans has been operated and administered in all material respects in compliance with applicable Law, including but not limited to ERISA and the Code; (ii) each of the Company Employee Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has received a determination letter from the IRS to such effect and the Company knows of no event that would cause the disqualification of any such Employee Plan; (iii) with respect to each Company Employee Plan that is subject to Title IV of ERISA, the present value of such Company Employee Plan's "accumulated benefit obligation," based on reasonable actuarial assumptions set forth in the actuarial statement for the Company Employee Plan, did not, as of its then latest valuation date, exceed the fair value of the assets of such Employee Plan allocable to such obligation in an amount that would have a Company Material Adverse Effect; (iv) no Company Employee Plan provides welfare benefits (whether or not insured) with respect to current or former employees of the Company or any of its subsidiaries beyond their retirement or other termination of service, other than coverage mandated by applicable law; (v) no liability under Title IV of ERISA or Section 412 of the Code has been incurred (directly or indirectly) by the Company or a Company ERISA Affiliate that has not been satisfied in full; (vi) no Company Employee Plan is a "multiemployer pension plan," as such term is defined in Section 3(37) of ERISA ("Multiemployer Plan"), or a plan described in Section 4063 of ERISA; (vii) all contributions or other amounts payable by the Company or any Company ERISA Affiliate as of the Closing Date with respect to each Company Employee Plan in respect of current or prior plan years have been paid or accrued in accordance with GAAP and, if applicable, Section 412 of the Code; (viii) to the knowledge of the Company, neither the Company, any subsidiary, nor any other Company ERISA Affiliate has engaged in a transaction in connection with which the Company or any of its subsidiaries or any other Company ERISA Affiliate would be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a tax imposed pursuant to Section 4975 or 4976 of the Code; (ix) there are no pending, anticipated or, to the knowledge of the Company, threatened claims (other than routine claims for benefits) by, on behalf of or against any of the Company Employee Plans or any trusts related thereto or against any employee benefit plan formerly maintained by the Company or any of its subsidiaries; (x) the Company Employee Plans could be terminated as of the Closing Date without any liability to Buyer, the Company or any of its subsidiaries or any other ERISA Affiliate that, individually or in the aggregate, would have a Company Material Adverse Effect; (xi) each agreement, contract or other commitment, obligation or arrangement relating to a Company Employee Plan or the assets of a Company Employee Plan (or its related trust) including, but not limited to, each administrative services agreement, insurance policy or annuity contract, may be amended or terminated at any time without any liability, cost, or expense, individually or in the aggregate, to the Company Employee Plan, the Company, or any of its subsidiaries that would have a Company Material Adverse Effect; (xii) neither the Company, any of its subsidiaries, nor any other Company ERISA Affiliate maintains or has ever participated in a multiple employer welfare arrangement as described in Section 3(40)(A) of ERISA; (xiii) no Lien has been filed by any person or entity and no Lien exists by operation of law or otherwise on the assets of the Company or any of its subsidiaries relating to, or as a result of, the operation or maintenance of any Company Employee Plan, and the Company has no knowledge of the existence of facts or circumstances that would result in the imposition of such Lien; (xiv) neither the execution and

Page 14

delivery of this Agreement nor the consummation of the transactions contemplated hereby will (1) result in any material payment becoming due to any director or any employee of the Company or any of its subsidiaries; (2) materially increase any benefits otherwise payable under any Company Employee Plan; (3) result in any acceleration of the time of payment or vesting of any benefits under any Company Employee Plan to any material extent; or (4) result, separately or in the aggregate, in an "excess parachute payment" within the meaning of Section 280G of the Code; and (xv) no amounts payable under any Company Employee Plan or other agreement or arrangement will fail to be deductible for United States federal income tax purposes by virtue of Section 162(m) of the Code.

(d)    To the knowledge of the Company, except as set forth in Section 3.09(d) of the Company Disclosure Letter, each of the Company and its subsidiaries is in compliance with all applicable Laws respecting employment, employment practices and wages and hours and with all provisions of each collective bargaining agreement to which it is a party. Except as set forth in Section 3.09(d) of the Company Disclosure Letter, there is no pending or, to the Company's knowledge, threatened (i) labor dispute, strike or work stoppage against the Company or any of its subsidiaries which may materially interfere with the respective business activities of the Company or any of its subsidiaries prior to or after the Effective Time or (ii) charge or complaint against the Company or any of its subsidiaries by the National Labor Relations Board or any comparable state agency.

(e)    Since December 31, 2001, except as set forth in Section 3.09(e) of the Company Disclosure Letter, there have not been any claims brought for violations of any law, rule, code, regulation or requirement of the Occupational Safety and Health Administration nor, to the Company's knowledge, have there been any violations of these laws, rules, codes, regulations or requirements.

SECTION 3.10.    *Taxes.*  Except for such matters as would not have a Company Material Adverse Effect, (i) all returns and reports relating to Taxes ("Tax Returns") required to be filed by or with respect to the Company and each of its subsidiaries have been timely filed; (ii) the Company and each of its subsidiaries has paid all Taxes that are due from or with respect to it; (iii) the Company and each of its subsidiaries has withheld and paid all Taxes required by all applicable laws to be withheld or paid in connection with any amounts paid or owing to any employee, creditor, independent contractor or other third party; (iv) there are no outstanding agreements, waivers, or arrangements extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, Taxes due from or with respect to the Company or any of its subsidiaries for any taxable period; (v) no audit, action, proceeding, investigation, dispute or claim by any court, governmental or regulatory authority, or similar person is being conducted or is pending or, to the Company's knowledge, threatened in regard to any Taxes due from or with respect to the Company or any of its subsidiaries or any Tax Return filed by or with respect to the Company or any of its subsidiaries; (vi) no claim has been made by a taxing authority in a jurisdiction in which the Company does not file Tax Returns that the Company is required to file Tax Returns in such jurisdiction; (vii) no assessment of any deficiency for Taxes is proposed against the Company or any of its subsidiaries or any of their assets; (viii) there are no Liens for Taxes (other than for current Taxes not yet due and payable) upon the assets of the Company or any of its subsidiaries; (ix) neither the Company nor any of its subsidiaries has any obligation or liability for the payment of Taxes of any other person arising

Page 15

as a result of Treas. Reg. §1.1502-6 (or any corresponding provision of state, local or foreign income tax laws) any obligation to indemnify another person or as a result of the Company or any of its subsidiaries assuming or succeeding to the Tax liability of any other person as a successor, transferee or otherwise; (x) all Taxes accrued but not yet due and all contingent liabilities for Taxes are adequately reflected in the reserves for Taxes in the financial statements referred to in <u>Section 3.04</u>; (xi) none of the Company or any of its subsidiaries has been a party to any distribution occurring during the last two years in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable; (xii) neither the Company nor any of its subsidiaries has requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed; (xiii) neither the Company nor any of its subsidiaries is a party to any contract that will result in a requirement to pay any "excess parachute payment" within the meaning of Section 280G of the Code in connection with the Merger; (xiv) neither the Company nor any of its subsidiaries is a party to a tax sharing or tax indemnity agreement or any other agreement of a similar nature that remains in effect; (xv) neither the Company nor any of its subsidiaries has filed a consent under Section 341(f) of the Code concerning collapsible corporations; and (xvi) the Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the period specified in Section 897(c)(1)(A)(ii) of the Code. No cancellation of indebtedness income will be incurred as a result of the Merger in excess of the net operating losses available to the Company to shelter fully such cancellation of indebtedness income.

SECTION 3.11.    *Environmental Matters.*

(a)    (i) To the Company's knowledge, there is no Release or threatened Release of any Hazardous Materials existing on, beneath or from the surface, subsurface or ground water associated with Company Property currently occurring, nor has any Release occurred at any time in the past, which would require investigation, reporting, response, remediation or other corrective action under any Environmental Law; (ii) to the Company's knowledge, the Company Property, and all uses and conditions of the Company Property and all operations of the Company, have been and are in compliance, in all material aspects, with all Environmental Laws; (iii) the Company has not received any notice of violation of Environmental Laws or other similar communication; (iv) to the Company's knowledge, there are no facts or circumstances relating to the Company Property or the business of the Company that would give rise to any material violation or liability under any Environmental Law; (v) to the Company's knowledge, the Company Property and the operations of the Company comply, in all material respects, with all terms and conditions of any permits issued under Environmental Laws; and (vi) no Environmental Claims against the Company or any of its subsidiaries or any Company Property are pending or, to the Company's knowledge, threatened.

(b)    For purposes of this Agreement, the following terms will have the following meanings: (i) "Company Property" means any real property and improvements at any time owned, leased or operated by the Company or any of its subsidiaries; (ii) "Hazardous Materials" means (A) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (B) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous

Page 16

wastes," "extremely hazardous substances," "restricted hazardous wastes," "toxic substances," "toxic pollutants," or words of similar import, under any applicable Environmental Law; and (C) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority; (iii) "Environmental Law" means any federal, state, foreign or local statute, law, rule, regulation, ordinance, guideline, policy, code or rule of common law in effect and in each case as amended as of the date hereof and the Closing Date, and any judicial or administrative interpretation thereof applicable to the Company or its operations or property as of the date hereof and the Closing Date, including any judicial or administrative order, consent decree or judgment, relating to the environment, health, safety or Hazardous Materials, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., and their state and local counterparts and equivalents; (iv) "Environmental Claims" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations or proceedings under any Environmental Law or any permit issued under any such Environmental Law (for purposes of this subclause (iv), "Claims"), including, without limitation, (A) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (B) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment; and (v) "Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying or seeping into or upon any land or water or air, or otherwise entering into the environment.

    SECTION 3.12.    *Brokers.*  Except for the fees payable to SunTrust Robinson Humphrey Capital Markets, Inc., which are included in the Deal Expenses to be paid out of the Cash Consideration in accordance with Section 2.01 hereof, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

    SECTION 3.13.    *Material Contracts.*  As of the date hereof and except as disclosed in Section 3.13 of the Company Disclosure Letter, neither the Company nor any of its subsidiaries is a party to or bound by (i) any "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K); (ii) any material joint ventures, partnerships, or similar arrangements; (iii) other agreements or arrangements that give rise to a right of the other parties thereto to terminate such material contract or to a right of first refusal or similar right thereunder as a result of the execution and delivery of this Agreement and the consummation by the Company of the Merger and the other transactions contemplated hereby; (iv) any material employment, consulting, severance or termination agreement with any director, officer, employee, agent or consultant of the Company or any of its subsidiaries; (v) any material severance programs, policies, plans or arrangements to which the Company or any of its

subsidiaries is obligated (except for any of such items that may be imposed by applicable Law); or (vi) any agreements, licenses or other arrangements that could, after the Effective Time, restrict Buyer or any of its affiliates or any successor thereto, from engaging in or competing with any line of business or in any geographic area (collectively, the "Company Material Contracts"). All Company Material Contracts are valid and in full force and effect except to the extent they have previously expired in accordance with their terms or if the failure to be in full force and effect would not have a Company Material Adverse Effect. Neither the Company nor any of its subsidiaries has violated any provision of, or committed or failed to perform any act that, with or without notice, lapse of time or both, would constitute a default under the provisions of, any Company Material Contract, except in each case for those violations and defaults which would not result in a Company Material Adverse Effect.

SECTION 3.14.    *Principal Customers and Suppliers*. Section 3.14 of the Company Disclosure Letter lists the ten largest customers by approximate annual revenue to the Company and its subsidiaries (the "Largest Customers") and the 25 largest suppliers (including lessors) by approximate annual payments of the Company and its subsidiaries (the "Largest Suppliers"), with the amount of revenues or payments, as applicable, attributable to each such customer and supplier for the Company's 2002 fiscal year and the first three months of its 2003 fiscal year. Except as described in the Company Disclosure Letter, none of the Largest Customers or Largest Suppliers has terminated or materially altered its relationship with the Company since the beginning of the Company's 2003 fiscal year, or, to the Company's knowledge, threatened to do so or otherwise notified the Company of any intention to do so, except for any such terminations or alterations as would not have a Company Material Adverse Effect.

SECTION 3.15.    *Intellectual Property*.

(a)    The Company and its subsidiaries own, or have the right to use without infringing or violating the rights of any third parties, except where such infringement or violation has not had, or would not have, a Company Material Adverse Effect: (i) each trademark, trade name, brand name, service mark or other trade designation owned or licensed by or to the Company or any of its subsidiaries, each patent, copyright and similar intellectual property owned or licensed to or by the Company and each license, royalty, assignment or other similar agreement and each registration and application relating to the foregoing that is material to the conduct of the business of the Company and its subsidiaries taken as a whole; and (ii) each agreement relating to technology, know-how or processes that the Company or its subsidiaries is licensed or authorized to use, or which it licenses or authorizes others to use, that is material to the conduct of the business of the Company and its subsidiaries taken as a whole (collectively, the "Company Intellectual Property"). No consent of third parties will be required for the use of the Company Intellectual Property after the Effective Time, except as set forth in the Company Disclosure Letter or where the failure to obtain such consent would not have a Company Material Adverse Effect. No claim has been asserted by any person against the Company or any of its subsidiaries regarding the ownership of or the right to use any Company Intellectual Property or challenging the rights of the Company or any of its subsidiaries with respect to any of the Company Intellectual Property which would have a Company Material Adverse Effect.

(b)    Except as set forth in the Company Disclosure Letter, to the Company's knowledge, no person or entity has asserted any claim that any product, activity or operation of

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

the Company or any of its subsidiaries infringes upon or involves, or has resulted in the infringement of, any proprietary right of such person or entity, except for such infringement which has not had or would not have a Company Material Adverse Effect; and no proceedings have been instituted, are pending or, to the Company's knowledge, are threatened which challenge the rights of the Company or any of its subsidiaries with respect thereto, which would have a Company Material Adverse Effect.

(c)    Section 3.15 of the Company Disclosure Letter contains a list of all software developed by employees of the Company in the scope of their employment.

SECTION 3.16.    *[Intentionally Deleted]*.

SECTION 3.17.    *State Takeover Laws*.  The Board of Directors of the Company has approved this Agreement and taken all other requisite action such that the provisions of any antitakeover laws and regulations of any Governmental Entity, including without limitation, the provisions of the Company's Certificate of Incorporation relating to special voting requirements for certain business combinations, will not apply to this Agreement or any of the transactions contemplated hereby.

SECTION 3.18.    *Books and Records*.  The books and records of the Company and its subsidiaries have been, and are being, maintained in accordance with applicable legal and accounting requirements in all material respects and reflect in all material respects the substance of events and transactions that should be included therein.

SECTION 3.19.    *Corporate Documents*.  The Company has made available to Buyer true and complete copies of its certificate of incorporation and bylaws and the certificates of incorporation and bylaws of its subsidiaries.  The minute books of the Company constitute a complete and correct record of all actions taken by the Board of Directors of the Company (and each committee thereof) and the Stockholders, and the minute books of each subsidiary of the Company constitute, in all material respects, complete and correct records of all material actions taken by the Board of Directors (and each committee thereof) and the stockholders of such subsidiary after December 31, 2001.

SECTION 3.20.    *Insurance*.  Section 3.20 of the Company Disclosure Letter sets forth a list of all material policies of insurance of the Company and its subsidiaries currently in effect, which list is accurate and complete in all material respects.  All of the policies relating to insurance maintained by the Company or any of its subsidiaries with respect to its material properties and the conduct of its business in any material respect (or any comparable policies entered into as a replacement therefor) are in full force and effect and neither the Company nor any of its subsidiaries has received any notice of cancellation with respect thereto.

SECTION 3.21.    *Labor*.  No work stoppage involving the Company or any of its subsidiaries is pending or, to the knowledge of the Company's management, threatened.  Neither the Company nor any of its subsidiaries is involved in, or, to the knowledge of the Company's management, threatened with or affected by, any dispute, arbitration, lawsuit or administrative proceeding relating to labor or employment matters which might reasonably be expected to interfere in any material respect with the respective business activities of the Company or any of

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

its subsidiaries. No employees of the Company or any of its subsidiaries are represented by any labor union, and, to the knowledge of the Company, no labor union is attempting to organize employees of the Company or any of its subsidiaries.

SECTION 3.22.    *Disclosure.*  The Company acknowledges and agrees that it has had full opportunity to perform due diligence on Buyer, its business, officers, directors, shareholders, employees and representatives, and that it is satisfied with the information it has received. The Company further acknowledges that it has had a reasonable time to ask questions and receive answers concerning the terms and conditions of the Merger and any other information concerning the Buyer.

SECTION 3.23.    *Indemnification.*  Except as disclosed in <u>Section 3.23</u> of the Company Disclosure Letter or provided in the certificate of incorporation or bylaws of the Company or in this Agreement, the Company is not a party to any indemnification agreement with any of its directors, officers, employees, agents or other persons who serve or served in any other capacity with any other enterprise at the request of the Company (a "<u>Covered Person</u>"), and there are no claims which to the knowledge of the Company have been or will be asserted for which any Covered Person would be entitled to indemnification under the certificate of incorporation or bylaws of the Company, applicable law, regulation or any indemnification agreement. All indemnification or similar agreements between the Company and the directors and officers of the Company are substantially similar, have been provided to Buyer and are identified in <u>Section 3.23</u> of the Company Disclosure Letter.

SECTION 3.24.    *Registration Rights.*  The Company is not under any obligation that will continue after the Closing, whether contingent or otherwise, to register any of its securities under the Securities Act.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUB

Buyer and Merger Sub, jointly and severally, represent and warrant to the Company that the statements contained in this Article IV are true and correct as of the date hereof and at the Effective Time (unless the particular statement is, by its language, as of another date, in which case, it is true and correct as of that other date), except as set forth in the disclosure letter delivered by Buyer and Merger Sub to the Company on or before the date of this Agreement (the "Buyer Disclosure Letter"):

SECTION 4.01.    *Organization; Qualification and Corporate Power.*  Each of Buyer and Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and is duly qualified and in good standing to do business in each jurisdiction in which the nature of the business conducted by it or the ownership or leasing of its properties makes such qualification necessary, other than where the failure to be so duly qualified and in good standing would not have a Buyer Material Adverse Effect. The term "Buyer Material Adverse Effect" as used in this Agreement means any change or effect that, individually or when taken together with

all other such changes or effects, would be materially adverse to the assets, financial condition, or results of operations of Buyer and its subsidiaries, taken as a whole; provided, that none of the following will be deemed in and of themselves to constitute, and none of the following will be taken into account in determining whether there has been, a Buyer Material Adverse Effect: (i) any adverse change, event, development or offset arising from or relating to (A) general business or economic conditions or (B) general business or economic conditions relating to any industries in which Buyer or any of its subsidiaries participates, in each case which is not specific to Buyer and its subsidiaries, and (ii) any adverse change, event, development or effect arising from or relating to any change in generally accepted accounting principles in the UK.

SECTION 4.02.    *Authority; No Conflict; Required Filings and Consents.*

(a)    Each of Buyer and Merger Sub has all requisite corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by Buyer and Merger Sub and the consummation by Buyer and Merger Sub of the transactions contemplated hereby have been duly authorized by all necessary corporate action.  This Agreement has been duly executed and delivered by each of Buyer and Merger Sub and constitutes a valid and binding obligation of each of Buyer and Merger Sub, enforceable against each of Buyer and Merger Sub in accordance with its terms, except as may be limited by bankruptcy, insolvency or other laws affecting the rights of creditors generally.

(b)    The execution and delivery of this Agreement by Buyer and Merger Sub does not, and the consummation by Buyer and Merger Sub of the transactions contemplated by this Agreement will not, (i) conflict with, or result in any violation or breach of any provision of Buyer's charter or bylaws or the charter or bylaws of any subsidiary of Buyer, (ii) result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, contract or other agreement, instrument or obligation to which Buyer or any of its subsidiaries is a party or by which any of them or any of their properties or assets may be bound except for violations, breaches, defaults, terminations, cancellations, accelerations or losses which would not, in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect or (iii) conflict with or violate any permit, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer or any of its subsidiaries or any of its or their properties or assets.

(c)    No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or other person is required to be obtained by, or given to or with respect to Buyer or any of its subsidiaries in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for (i) the filing of a certificate of merger with, and the acceptance of such filing by, the Secretary of State and (ii) the third-party consents identified in <u>Section 4.02(c)</u> of the Buyer Disclosure Letter (the consents identified in clause (ii) hereof being referred to collectively as the "Buyer Third-Party Consents").

SECTION 4.03.    *Vote Required.*  The Board of Directors of Buyer at a meeting duly called and held (i) determined that the Merger is advisable and fair and in the best interests of Buyer and its stockholders; and (ii) approved the Merger and this Agreement and the transactions contemplated by this Agreement.  No vote of the stockholders of Buyer is required to approve this Agreement or the Merger.

SECTION 4.04.    *Brokers.*  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

SECTION 4.05.    *Funding.*  Buyer has sufficient funds and will have sufficient funds as of the Closing Date to pay the Cash Consideration.

## ARTICLE V

## COVENANTS

SECTION 5.01.    *Covenants of the Company.*

(a)    <u>General</u>.  Except as expressly provided in this Agreement, during the period from the date of this Agreement to the Effective Time, the Company will (i) conduct its business in all material respects in the usual, regular and ordinary course consistent with past practice (using the immediately prior twelve-month period as an indicator); (ii) use its commercially reasonable efforts to maintain and preserve intact its business organization, properties, leases, employees and business relationships, including maintaining satisfactory relationships in all material respects with suppliers and customers and other persons having business dealings with it, and retain the services of its officers and key employees, (iii) take no action which would adversely affect or delay the ability of the Company or Buyer to perform their covenants and agreements on a timely basis under this Agreement, (iv) take no action that results in or is reasonably likely to have a Company Material Adverse Effect, except that any actions taken by the Company pursuant to this Agreement, at the written request of Buyer or with the written consent of Buyer, will not be deemed to have a Company Material Adverse Effect; (v) not materially accelerate the collection of receivables or materially extend payment of liabilities, or otherwise permit a material change in any of the accounts comprising its working capital, such that the Net Working Capital of the Company immediately prior to the Closing will not be less than $9,250,000.  For purposes of this Agreement, "Net Working Capital" means current assets (not including any Prepaid Deal Expenses) less current liabilities; provided that current liabilities will not include the Bank Debt, the Deal Expenses, the Prepaid Deal Expenses, the Subordinated Debt or any accrued dividends on Preferred Stock.

(b)    <u>Forbearance by the Company</u>.  Without limiting the covenants set forth in <u>Section 5.01(a)</u> hereof, during the period from the date of this Agreement to the Effective Time, the Company will not, without the prior written consent of Buyer, which consent will not be unreasonably withheld or delayed:

(i)    change any provisions of the certificate of incorporation or bylaws of the Company;

(ii)    purchase Company Common Stock, issue, deliver, sell, pledge, dispose of, grant, encumber, or authorize the issuance, delivery, sale, pledge, disposition, grant or encumbrance of, any shares of capital stock of any class of the Company or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such capital stock currently reserved for future issuance or any other ownership interest of the Company, or enter into any agreement with respect to any of the foregoing other than as contemplated herein;

(iii)    sell, transfer, mortgage, encumber or otherwise dispose of any of its material properties, leases or assets to any individual, corporation or other entity or cancel, release or assign any indebtedness of any such person, except in the ordinary course of business or in amounts less than $10,000;

(iv)    except for periodic salary adjustments all in keeping with past practice, and previously disclosed to Buyer and except in connection with regular open enrollment periods for Company benefit plans, increase in any manner the compensation or fringe benefits of any of its employees or directors, or pay any pension or retirement allowance not required by any existing plan or agreement to any such employees, or become a party to, amend or commit itself to or fund or otherwise establish any trust or account related to any Employee Plan with or for the benefit of any employee or director; terminate or increase the costs to the Company of any Employee Plan, other than as set forth in this Agreement; hire any employee (other than to replace an existing employee at a comparable salary); enter into or amend any employment, commission or bonus contract; make any discretionary contributions to any Employee Plan, or amend any Employee Plan other than as required by applicable laws or regulations and other than as may be necessary or advisable, in the opinion of the Company 's counsel, to maintain the tax qualified status of any such plan, provided that no such amendment will increase the benefits payable under such plan or increase Buyer's obligations thereunder;

(v)    change its method of accounting as in effect at December 31, 2002, except as required by changes in GAAP as concurred in writing by the Company's independent auditors;

(vi)    enter into any contract or agreement that is not terminable without liability within 30 days, or make any change in, or terminate, any of its leases or contracts, other than with respect to those involving aggregate payments of less than, or the provision of goods or services with a market value of less than $15,000 per annum, and other than as specifically provided for in this Agreement;

(vii)    pay, discharge or satisfy any claim, liability or obligation, other than payment, discharge or satisfaction in the ordinary course of business and consistent with past practice of the Company (using the immediately preceding 12-month period prior to Closing as an indicator);

(viii)    except in the ordinary course of business, or in amounts less than $10,000, waive or release any material right or collateral or cancel or compromise any extension of credit or other debt or claim;

(ix)    enter into any new line of business or materially expand the business currently conducted by the Company or file any application to relocate or terminate the operations of any office of the Company;

(x)    acquire or agree to acquire, by merging or consolidating with, or by purchasing an equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, or other business organization or division thereof or otherwise acquire or agree to acquire any assets, in each case which are material, individually or in the aggregate, to the Company;

(xi)    incur any additional borrowings, or pledge any of its assets to secure any borrowings other than as required pursuant to the terms of borrowings of the Company in effect at the date hereof or in connection with borrowings permitted hereunder;

(xii)    make any single capital expenditure in excess of $25,000 or capital expenditures which are in the aggregate in excess of $100,000 for the Company;

(xiii)    fail to maintain all its properties in repair, order and condition no worse than on the date of this Agreement (ordinary wear and tear excepted) [or fail to maintain insurance until the Effective Date upon all its properties and with respect to the conduct of its business in amount and kind as now in existence and, if not available at rates presently paid by it, in such amount and kind as would be appropriate in the exercise of good business judgment];

(xiv)    capitalize, lend to or otherwise invest in or acquire any equity or voting interest in any firm, corporation or business enterprise;

(xv)    nominate to the Board of Directors of the Company any person who is not a member of the Board of Directors of the Company as of the date of this Agreement;

(xvi)    agree or make any commitment to take any action that is prohibited by this Section 5.01(b); or

(xvii)    declare, set aside, make or pay any dividend or other distribution that is payable in cash, stock, property or otherwise, with respect to its capital stock, except in accordance with past practice in the past 12 months and as required by applicable certificates of designation with respect to currently outstanding shares of Preferred Stock.

The Company's representations, warranties and covenants contained in this Agreement will not be deemed to be untrue or breached in any respect for any purpose as a consequence of the Company's compliance with this Section 5.01(b).

(c)    Extinguishment of Options and Warrants.  The Company will cause the termination or release of all outstanding options and warrants to purchase shares of capital stock of the Company and its subsidiaries, by the Corporate Option Cancellation Transaction or otherwise.

SECTION 5.02.    Cooperation.  Subject to compliance with applicable Law, from the date hereof until the Effective Time, the Company will permit Buyer's management

Page 24

personnel to be onsite at the Company for the purpose of observing the business and participating in management decisions; provided, that any final management decisions of the Company will be the prerogative of the Company's management personnel or Board of Directors, as applicable. Three representatives of the Buyer will also receive prior notice of and, except as may be limited by federal or state antitrust or similar laws, be entitled to attend and participate in the Company's weekly management meetings; provided that all decision making authority will remain with the Company's management. The parties agree that they may consider in such meetings integration of networks, outsourcing of services and the possible establishment of an Indian subsidiary of the Company.

SECTION 5.03.    *Exclusivity.*

(a)    Without limitation on the Company's other obligations under this Agreement, the Company agrees that it will not, directly or indirectly, through its directors, officers, controlling stockholders, representatives or otherwise, except as permitted by Section 5.03(b), initiate, take any action to facilitate, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other person relating to the acquisition by such other person of the Company by way of any direct purchase of securities, incurrence, purchase or assumption of indebtedness, merger, consolidation, recapitalization, joint venture, business combination, exchange offer or purchase or sale of securities or assets.

(b)    If there has been no breach of Section 5.03(a), the Company and its Board of Directors may:

(i)    enter into discussions or negotiations with any person in response to an unsolicited bona fide written acquisition proposal (an "Acquisition Proposal") if (x) the Board of Directors of the Company determines in good faith, after having taken into account the advice of its outside legal counsel, that it is required to take such action in order to discharge properly its fiduciary duties under applicable law, and (y) immediately upon entering into such discussions or negotiations, the Company provides Buyer with written notice of its decision to enter into such discussions or negotiations.

(ii)    agree to, approve or recommend an Acquisition Proposal if (x) If the Board of Directors determines that an Acquisition Proposal constitutes a Superior Proposal, (y) the Board of Directors determines in good faith, after having taken into account the advice of its outside legal counsel, that it is required to take such action in order to discharge properly its fiduciary duties under applicable law, and (z) the Company makes any payment required to be made pursuant to Section 9.02(c). For purposes of this Agreement, a "Superior Proposal" means an Acquisition Proposal that the Board of Directors determines in good faith, after consultation with its financial advisor and taking into account all legal, financial, regulatory and other aspects of the proposal and the person making the proposal, would, if consummated, result in a transaction more favorable to the Stockholders and Noteholders from a financial point of view than the transactions contemplated by this Agreement.

[TPW: NYLEGAL:156436.2] 19935-00000 06/26/2003 2:22 PM                    007157.00066:782833.012

SECTION 5.04.    *Access and Information.*

(a)    The Company will, and will cause its subsidiaries to, upon 24 hours' prior written notice, afford Buyer and its officers, directors, employees, accountants, consultants, legal counsel, agents and other representatives (collectively, the "Buyer Representatives") reasonable access, at reasonable times throughout the period prior to the Effective Time, to the personnel, properties, contracts, business and financial information, auditor's work papers (subject to reasonable consent of the outside auditors), books and records, and all other documents and data. Such prior written notice will describe, in reasonable detail, the scope of the due diligence to be conducted by the Buyer Representatives.  Notwithstanding the foregoing, the Company will not be required to grant access or furnish information to the Buyer Representatives to the extent that such access or the furnishing of such information would be prohibited by Law or would waive any rights to privileged communications. Notwithstanding the foregoing, the parties (and each employee, representative, or other agent of the parties) may disclose to any and all persons, without limitation of any kind, the tax treatment and any facts that may be relevant to the tax structure of the transaction beginning on the earliest of (i) the date of the public announcement of discussions relating to the transaction, (ii) the date of public announcement of the transaction, or (iii) the date of the execution of an agreement (with or without conditions) to enter into the transaction; provided, however, that neither party (nor any employee, representative or other agent thereof) may disclose any other information that is not relevant to understanding the tax treatment and tax structure of the transaction (including the identity of any party and any information that could lead another to determine the identity of any party), or any other information to the extent that such disclosure could result in a violation of any federal or state securities law.

(b)    The information received pursuant to Section 5.04(a) will be deemed to be "Confidential Information" for purposes of the Confidentiality Agreement between Buyer and the Company dated April 4, 2003 (the "Confidentiality Agreement").

SECTION 5.05.    *Public Announcements.*  Except as and to the extent required by applicable Law, neither Buyer nor the Company, without the consent of the other party, will, and each will direct its representatives not to, make, directly or indirectly, any public comment, statement or communication with respect to the Merger or the transactions contemplated hereby. The press release announcing the execution and delivery of this Agreement will be a joint press release of Buyer and the Company.  Notwithstanding the foregoing, the parties and their respective representatives may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Merger and the transactions contemplated by this Agreement.

SECTION 5.06.    *Employee Benefits.*

(a)    For at least the first 12 months after the Closing Date, Buyer will cause the current and former employees of the Company and its subsidiaries who are, on the Closing Date, entitled to receive compensation or any benefits from the Company or any of its subsidiaries to be provided with compensation and employee benefit plans (other than stock option or other plans involving the potential issuance of securities of the Company) which, in the aggregate, are substantially comparable to those currently provided to such employees by the Company and its

subsidiaries, to the extent permitted under laws and regulations in force from time to time; provided that employees covered by collective bargaining agreements need not be provided with such benefits other than pursuant to such collective bargaining agreements. The provisions of this Section 5.06(a) will not create in any current or former employee of the Company or any of its subsidiaries any rights to employment or continued employment with Buyer, the Company or any of their respective subsidiaries, or any right to specific terms or conditions of employment.

(b)    Notwithstanding anything in this Agreement to the contrary and subject to the provisions of Section 5.06(a), from and after the Closing Date, Buyer will have sole discretion over the hiring, promotion, retention, termination and other terms and conditions of the employment of the employees of the Company and its subsidiaries. Subject to the provisions of Section 5.06(a), nothing herein will prevent Buyer, the Company or any of their respective subsidiaries from amending or terminating any Employee Plan maintained by the Company or its subsidiaries or other employee benefit or fringe benefit plan of Buyer in accordance with its terms.

(c)    The Buyer will grant all employees of the Company and its subsidiaries on and after the Closing Date credit for all service with the Company and its subsidiaries and any of their respective predecessors prior to the Closing Date for purposes of eligibility and vesting under any employee benefit plan of Buyer in which the employees may become participants.

(d)    As of the Closing Date, Buyer will assume, honor and perform, or will cause the Company and its subsidiaries to assume, honor and perform, the benefits accrued as of the Closing Date under all deferred compensation, incentive compensation (other than the 2003 bonuses described in Section 5.06(f), which will be paid only as provided in Section 5.06(f)) or vacation and other paid time off plans, policies or arrangements maintained or contributed to by the Company and its subsidiaries and any employment, consulting, retention, severance or similar agreement to which the Company is a party with any employees of the Company or any of its subsidiaries (but not including arrangements related to the consummation of the Merger and the other transactions contemplated by this Agreement that are in place on the date hereof between the Company and certain of its employees (the "Retention Bonuses")), in accordance with the terms thereof in effect immediately prior to the Closing Date and to the extent that such plans, policies, arrangements and agreements are listed in Section 3.09 of the Company Disclosure Letter. Subject to the requirements of Section 5.06(a) and except as otherwise provided in the Company Disclosure Letter, Buyer may revise and modify such plans, policies or arrangements for benefits accruing after the Closing Date.

(e)    The Buyer will provide or cause to be provided, effective commencing immediately after the Closing Date, coverage on similar terms and conditions to those in effect immediately prior to the Effective Time to employees of the Company and its subsidiaries as of the Closing Date, and their spouses and dependents, under a group health plan which does not contain any exclusion or limitation with respect to any pre-existing conditions and provides full credit for all deductibles, co-insurance and out-of-pocket maximums incurred under any group health plan covering such employees or qualified dependents prior to the Closing Date and within the same plan year of such employee benefit plan, and Buyer will be solely responsible for compliance with the requirements of Section 4980B of the Code and part 6 of the subtitle B of Title I of ERISA ("COBRA"), including, without limitation, the provision of continuation

Page 27

coverage, with respect to all employees of the Company and its subsidiaries and their spouses and dependents, for whom a qualifying event occurs before or after the Closing Date. The terms "group health plan," "continuation coverage," "qualifying event," and "qualified beneficiary" are used herein with the meanings ascribed to them in COBRA.

(f)    Buyer will pay the 2003 bonuses set forth in Section 5.06(f) of the Company Disclosure Letter in accordance with the terms of the Employment Agreements (as defined in Section 7.02(o)) and the bonus and commission plans set forth in Section 3.09(a) of the Company Disclosure Letter.

SECTION 5.07.    *Employment Agreements.*    Effective as of the Effective Time, Buyer will enter into employment agreements with certain management employees of the Company, which employees will be mutually identified by Buyer, the Company and such employees. Each such employment agreement will include duties and responsibilities (including but not limited to the position to whom the employee reports), terms and conditions of employment, and compensation and benefits that are at least equivalent to those currently enjoyed by such employee, will be for a minimum term of one year and will include customary non-compete provisions.

SECTION 5.08.    *Deregistration of the Company.*    As soon as practicable after the Effective Time, Buyer will take all necessary actions to file with the SEC a Form 15 certifying the termination of the Company's obligation to file reports under the Exchange Act.

SECTION 5.09.    *Legal Conditions to Merger.*    Each party to this Agreement will take all commercially reasonable actions necessary to comply promptly with all legal requirements which may be imposed on such party with respect to the Merger and will take all commercially reasonable actions necessary to cooperate with and furnish information to the other parties in connection with any such requirements imposed upon such other parties in connection with the Merger. Each party will take all commercially reasonable actions necessary:

(a)    to obtain (and will take all reasonable actions necessary to promptly cooperate with the other parties in obtaining) any consent, authorization, order or approval of, or any exemption by, any Governmental Entity or other third party required to be obtained or made by such party (or by the other parties) in connection with the Merger or the taking of any action contemplated by this Agreement;

(b)    to defend, lift, rescind or mitigate the effect of any lawsuit, order, injunction or other action adversely affecting the ability of such party to consummate the transactions contemplated hereby; and

(c)    to fulfill all conditions precedent pursuant to this Agreement.

SECTION 5.10.    *Consents.*    Each party will use its commercially reasonable efforts, and the other parties will cooperate with such efforts, to obtain any consents and approvals of, or effect the notification of or filing with, each person or authority, whether private or governmental, whose consent or approval is required in order to permit the consummation of the Merger and the transactions contemplated hereby and to enable the Surviving Corporation to

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

conduct and operate the business of the Company substantially as presently conducted and as proposed to be conducted.

SECTION 5.11.    *Efforts to Consummate.*  Subject to the terms and conditions herein provided, each of the parties hereto will, in good faith, use commercially reasonable effort to do or cause to be done all such acts and things as may be necessary, proper or advisable, consistent with all applicable laws and regulations, to consummate and make effective the transactions contemplated hereby and to satisfy or cause to be satisfied all conditions precedent that are applicable to each such party that are set forth in this Agreement as soon as reasonably practicable.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

SECTION 6.01.    *Meeting of Stockholders.*  The Company will duly take all lawful action to call, give notice of, convene and hold a meeting of the Stockholders as soon as reasonably practicable (the "Stockholders Meeting") for the purpose of obtaining the Merger Vote and will its use commercially reasonable efforts to solicit the adoption of the Agreement by the Merger Vote; and the Board of Directors of the Company will recommend adoption of this Agreement by the Stockholders, and will not (a) withdraw, modify or qualify (or propose to withdraw, modify or qualify) in any manner adverse to Buyer such recommendation, or (b) take any action or make any statement in connection with the Stockholders Meeting that is inconsistent with such recommendation; provided, however, that the Board of Directors of the Company may make a change in its recommendation pursuant to Section 5.03(b) hereof. Notwithstanding any change in the recommendation of the Board of Directors, this Agreement will be submitted to the Stockholders at the Stockholders Meeting for the purpose of adopting this Agreement and nothing contained herein will be deemed to relieve the Company of such obligation.

SECTION 6.02.    *Preparation of Proxy Statement.*

(a)    As promptly as reasonably practicable following the date hereof, the Company and Buyer will cooperate in preparing and the Company will cause to be filed with the SEC proxy materials that constitute the proxy statement relating to the matters to be submitted to the Stockholders at the Stockholders Meeting (such proxy statement and any amendments or supplements thereto, the "Proxy Statement"). The Company will use reasonable best efforts to have the Proxy Statement cleared by the SEC. The Company will, as promptly as practicable after receipt thereof, provide Buyer with copies of any written comments and advise Buyer of any oral comments received from the SEC with respect to the Proxy Statement. The parties will cooperate and the Company will provide Buyer with a reasonable opportunity to review and comment on any amendment or supplement to the Proxy Statement prior to filing such with the SEC, and will provide Buyer with a copy of all such filings made with the SEC. Notwithstanding any other provision herein to the contrary, no amendment or supplement (including by incorporation by reference) to the Proxy Statement will be made without Buyer's approval, which approval will not be unreasonably withheld or delayed. The Company will use commercially reasonable efforts to cause the Proxy Statement to be mailed to the Stockholders as

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

promptly as practicable after the Proxy Statement is cleared by the SEC. If at any time prior to the Effective Time any information relating to Buyer or the Company, or any of their respective affiliates, officers or directors, should be discovered by Buyer or the Company, which information should be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party that discovers such information will promptly notify the other party and, to the extent required by applicable Law, an appropriate amendment or supplement describing such information will be promptly filed with the SEC and disseminated to the Stockholders.

    (b)   <u>Information Supplied</u>.

    (i)   None of the information supplied or to be supplied by Buyer or the Company for inclusion or incorporation by reference in the Proxy Statement will, on the date it is first mailed to the Stockholders or at the time of the meeting of the Stockholders, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. With regard to the information supplied or to be supplied by Buyer or the Company for inclusion or incorporation by reference in the Proxy Statement, such information will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations promulgated thereunder.

    (ii)   Notwithstanding the foregoing provisions of this <u>Section 6.02</u>, no representation or warranty is made by either party hereto with respect to statements made or incorporated by reference in the Proxy Statement based on information supplied by the other party hereto for inclusion or incorporation by reference therein.

SECTION 6.03.   *Indemnification of Officers and Directors of the Company.*

    (a)   Until the completion of a Public Offering, if any, Buyer will cause the Surviving Corporation to maintain the Company's existing indemnification provisions as of the date hereof with respect to present and former directors, officers, employees and agents of the Company and all other persons who may presently serve or have served at the Company's request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (collectively, the "Indemnified Persons") for all expenses, judgments, fines and amounts paid in settlement by reason of actions or omissions or alleged actions or omissions occurring at or prior to the Effective Time to the fullest extent permitted or required under applicable law and the Company's certificate of incorporation or bylaws in effect as of the date of this Agreement (to the extent consistent with applicable law), for a period of not less than six years after the Effective Time, and shall cause the Surviving Corporation to perform its obligations under such indemnification provisions in accordance with their respective terms; provided, however, that as a condition to the release of Buyer of its obligations under this <u>Section 6.03</u> upon the completion of any such Public Offering, the Surviving Corporation will first have fully assumed all of the obligations of Buyer set forth in this <u>Section 6.03</u>.

[TPW: NYLEGAL:156436.2] 19935-00000 06/26/2003 2:22 PM

007157.00066:782833.012

For purposes of this Agreement, "Public Offering" means any underwritten public offering or series of public offerings by the Surviving Corporation which results in Buyer (together with all its affiliates) ceasing to be the "beneficial owner" (as such term is defined in Rules 13d-3 and 13d-5 under the Exchange Act) of at least 33% of the capital stock of the Surviving Corporation.

(b)     If Buyer, the Surviving Corporation or any of its or their successors or assigns (i) consolidates with or merges into any other corporation or entity and is not the continuing or surviving corporation or entity of such consolidation or merger, or (ii) transfers all or substantially all of its properties and assets to any individual, corporation or other entity, then and in each such case, proper provisions will be made so that the successors and assigns of Buyer or the Surviving Corporation, as the case may be, assume all of the obligations set forth in this Section 6.03.

(c)     The provisions of this Section 6.03 are intended to be for the benefit of, and will be enforceable by, each of the Indemnified Persons, their heirs and their representatives.

(d)     Nothing in this Agreement is intended to, will be construed to or will release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company or any of its directors or officers, it being understood and agreed that the indemnification provided for in this Section 6.03 is supplemental and not prior to or in substitution for any such claims under such policies.

SECTION 6.04.     *Additional Agreements.*  Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all commercially reasonable efforts to take promptly, or cause to be taken promptly, all actions and to do promptly, or cause to be done promptly, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including using efforts to obtain all necessary actions or non-actions, extensions, waivers, consents and approvals from all applicable Governmental Entities, effecting all necessary registrations, applications and filings and obtaining any required contractual consents and regulatory approvals.

SECTION 6.05.     *Corporate Option Cancellation Transaction.*  Prior to the Closing Date, the Company shall take action (the "Corporate Option Cancellation Transaction") in order to terminate, cancel, extinguish and/or release all of the options to purchase Company Common Stock that are outstanding as of the date hereof.

SECTION 6.06.     *Judicial Relief.*  To the Company's knowledge, all of the outstanding shares of Series B Preferred Stock are owned by Freiburghaus & Partners, S.A. The approval of holders of a majority of the shares of the Series B Preferred Stock is necessary to approve the Merger. Based on the Company's prior experience in stockholder matters, the Company anticipates that the holder of the Series B Preferred Stock will not vote its shares at the Stockholders Meeting in person or by proxy. Accordingly, unless the Company learns after the date hereof that the holder of the Series B Preferred Stock is likely to vote its shares at the Stockholders Meeting in person or by proxy, the Company will, by no later than the date of the Stockholders Meeting, file an action in the Delaware Chancery Court (the "Court") requesting

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM                                   007157.00066:782833.012

judicial relief ("Judicial Relief") that will permit the Company to proceed with the Merger and protect the Company from liability to the holders of the Series B Preferred Stock in the event the Merger is consummated (other than the payment of any accrued dividends or liquidation preference due and payable in respect of the Series B Preferred Stock).

SECTION 6.07.    *ATC Transaction.*  Pursuant to disclosure under <u>Article III</u> hereof, the Company has represented that approximately 1.23% of the outstanding shares of common stock of Advanced Telemarketing Corporation, a Nevada corporation ("ATC"), a subsidiary of the Company, is owned by certain employees and other former public shareholders of ATC (the "ATC Shareholders").  Prior to Closing, pursuant to a subsidiary merger or other transaction, the Company will cause all of the shares of ATC that are not owned by the Company to be redeemed or otherwise cancelled (the "ATC Transaction").

SECTION 6.08.    *Update of Company Disclosure Letter.*  From time to time prior to the Effective Time, the Company may supplement or amend the Company Disclosure Letter to reflect any matter which, if existing, occurring or known on the date of this Agreement, would have been required to be set forth or described in the Company Disclosure Letter or which is necessary to correct any information in the Company Disclosure Letter which has been rendered inaccurate thereby.  No supplement or amendment to the Company Disclosure Letter will have any effect for the purpose of determining satisfaction of the conditions precedent to the Merger to be satisfied by the Company or the compliance by the Company with the covenants to be satisfied by the Company pursuant to this Agreement, nor will any supplement or amendment, in itself, be evidence or admission of any breach of any representation or warranty or of any covenant which may have required any different earlier disclosure.

SECTION 6.09.    *Notification of Certain Matters.*  Each of the Company and Buyer shall give prompt notice to the other party of any notice or other communication from any third party alleging that the consent of such third party is or may be required in connection with any of the transactions contemplated by this Agreement.

SECTION 6.10.    *BDO Opinion and Side Letter.*  The Company will use all commercially reasonable efforts to obtain, at or prior to Closing, and the Company will pay for after Closing, (a) an opinion letter (the "Opinion Letter")from BDO confirming (i) that the Company's total useable net operating losses ("NOL's") for fiscal year 2002 are not less than $11,000,000 (after taking into account the effect of the lack of deductibility of any interest payable on the Company's convertible debt), (ii) that the Company's total useable NOL's for fiscal year 2001 are approximately $1,300,000, and (iii) that the Company will not recognize any forgiveness of indebtedness income as a result of the Merger in excess of the amount of NOL's available to shelter such income; and (b) a side letter (the "Side Letter," which Side Letter shall not be deemed to be an opinion) that, based on BDO's review of work performed by prior auditors of the Company, the aggregate amount of NOL's available to the Company to shelter taxable income for fiscal years prior to 2002 is approximately $29,000,000.

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

# ARTICLE VII

## CLOSING CONDITIONS

SECTION 7.01.    *Conditions to Obligations of Each Party Under This Agreement.* The respective obligations of each party to effect the Merger and the other transactions contemplated hereby will be subject to the satisfaction on or prior to the Closing Date of the following conditions, any or all of which may be waived in writing by the parties hereto, in whole or in part, to the extent permitted by applicable Law:

(a)    The transactions contemplated by the Agreement will have been approved by the Merger Vote.

(b)    No Governmental Entity or federal or state court of competent jurisdiction will have enacted, issued, promulgated, enforced or entered any order, judgment, injunction or decree (whether temporary, preliminary or permanent) or any other judicial, administrative or legislative action or proceeding ("Order") which is in effect and which has the effect of making the Merger illegal or otherwise prohibiting consummation of the Merger. No statute, rule or regulation will have been enacted, entered, promulgated, interpreted, applied or enforced by any Governmental Entity which prohibits or makes illegal consummation of the Merger or any other transaction contemplated by this Agreement.

(c)    Buyer, each of the Escrowing Parties, the Representative and the Payment and Escrow Agent will have executed and delivered the Payment and Escrow Agreement.

SECTION 7.02.    *Additional Conditions to Obligations of Buyer and Merger Sub.* The obligations of Buyer and Merger Sub to effect the Merger and the other transactions contemplated hereby are also subject to the satisfaction at or prior to the Closing Date of the following conditions, any or all of which may be waived in writing by Buyer, in whole or in part:

(a)    Each of the representations and warranties of the Company contained in this Agreement will be true and correct in all material respects (if not subject to a materiality qualifier) or in all respects (if subject to a materiality qualifier) as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties will be true and correct in all material respects (if not subject to a materiality qualifier) or in all respects (if subject to a materiality qualifier) as of such earlier date); except where the failure of such representation and warranty to be so true and correct would not result in a Company Material Adverse Effect. Buyer and Merger Sub will have received a certificate of a senior executive officer of the Company, dated as of the Closing Date, to such effect.

(b)    The Company will have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date. Buyer and Merger Sub will have received a certificate of a senior executive officer of the Company, dated as of the Closing Date, to such effect.

(c)    There will have been no change, occurrence or circumstance in the assets, financial condition, results of operations or material significant customer relationships of the

Company or any of its subsidiaries (using the twelve-month period immediately prior to Closing as an indicator) having or that would have a Company Material Adverse Effect. Buyer and Merger Sub will have received a certificate of a senior executive officer of the Company dated the Closing Date, to such effect.

(d)    The Company will have delivered to Buyer resignations of certain officers and directors of the Company, which individuals have been identified and agreed to by Buyer and the Company prior to the date hereof.

(e)    The Company will have obtained the Company Third Party Consents and delivered evidence thereof reasonably satisfactory to Buyer.

(f)    The Company will have delivered releases or other appropriate evidence of termination reasonably acceptable to Buyer, effective as of the Effective Time, of the Bank Debt (including related security agreements, guaranties and other related documents), Subordinated Debt, all other claims of controlling stockholders, directors and officers (other than pursuant to employment or severance obligations, the Retention Bonuses or indemnification obligations under the Company's certificate of incorporation or bylaws or indemnity agreements or the Payment and Escrow Agreement and, in addition, in the case of directors, reimbursement of reasonable expenses incurred in the course of such person's performance of his duties as a director, such expenses not to exceed $2,500 in the aggregate per director) and all options and warrants to purchase shares of capital stock of the Company.

(g)    There will be as of the Closing Date no pending or threatened material litigation or claims against the Company that have not been publicly disclosed in Company Reports or disclosed to Buyer in writing prior to the date hereof, or other litigation or claims against the Company relating to the Merger unless indemnifiable under the Payment and Escrow Agreement.

(h)    The Company will have delivered to Buyer updated financial statements through the Company's last calendar quarter prior to the Closing, which financial statements have been reviewed by the Company's auditors for filing with the SEC.

(i)    Buyer will have received an opinion of counsel to the Company substantially in the form attached hereto as Exhibit E.

(j)    The Company will provide to Buyer certificates dated as of a day as close as practicable to the Closing Date from appropriate Governmental Entities as to the good standing or corporate existence, as applicable, of the Company.

(k)    The Company will provide evidence reasonably satisfactory to Buyer that the Corporate Option Cancellation Transaction has been completed and all options and warrants to purchase shares of capital stock of the Company and its subsidiaries have been terminated, cancelled, extinguished or released.

(l)    The Company will have received the Judicial Relief, if necessary, and such Judicial Relief will be reasonably acceptable to Buyer in all material respects.

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

(m)     Buyer will have received executed copies of Voting Agreements, substantially in the form attached hereto as <u>Exhibit F</u>, from each of the Noteholders and from each of Questor Partners Fund II, L.P., Questor Side-By-Side Partners II, L.P. and Questor Side-By-Side Partners II 3(C)(1), L.P.

(n)     The Dissenting Shares will not exceed 10% of the total outstanding shares of Company Common Stock outstanding immediately prior to the Closing.

(o)     Herman Schwarz, Thomas Franklin, Angelo Macchia and Lee Waters will have entered into employment agreements with the Surviving Corporation, substantially in the forms attached hereto as <u>Exhibits G1-G4</u> (the "Employment Agreements").

(p)     The Company will provide evidence reasonably satisfactory to Buyer that the ATC Transaction has been completed.

(q)     The Net Working Capital of the Company at Closing will be not less than $9,250,000.

(r)     The Company will have received the BDO Opinion and the Side Letter and each shall be reasonably satisfactory to Buyer in all material respects.

SECTION 7.03.    *Additional Conditions to Obligations of the Company.*    The obligations of the Company to effect the Merger and the other transactions contemplated hereby are also subject to the satisfaction at or prior to the Closing Date of the following conditions, any or all of which may be waived in writing by the Company, in whole or in part:

(a)     Each of the representations and warranties of Buyer contained in this Agreement will be true and correct in all material respects (if not subject to a materiality qualifier) or in all respects (if subject to a materiality qualifier) as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties will be true and correct in all material respects (if not subject to a materiality qualifier) or in all respects (if subject to a materiality qualifier) as of such earlier date); except where the failure of such representation and warranty to be so true and correct would not result in a Buyer Material Adverse Effect. The Company will have received a certificate of a senior executive officer and a senior financial officer of each of Buyer and Merger Sub, dated as of the Closing Date, to such effect.

(b)     Each of Buyer and Merger Sub will have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date. The Company will have received a certificate of a senior executive officer and a senior financial officer of each of Buyer, dated as of the Closing Date, to such effect.

(c)     At or prior to the Closing, the Company will purchase a single-premium six-year policy of directors' and officers' liability insurance covering current and former officers and directors of the Company and its subsidiaries in the same amounts and on terms and conditions, including limits, as favorable to such officers and directors as the policies in effect as

[TPW: NYLEGAL:156436.2] 19935-00000 06/26/2003 2:22 PM

007157.00066:782833.012

of the date hereof (provided that Buyer may substitute for the policies carried by the Company policies of at least the same coverage containing terms and conditions which are not less advantageous to the beneficiaries thereof) with respect to matters or events occurring prior to the Effective Time ("Tail Coverage").

# ARTICLE VIII

# INDEMNIFICATION

SECTION 8.01.        *Survival.*

(a)        The respective representations, warranties, covenants and agreements of the Company and Buyer contained in this Agreement will survive the Closing for a period of 12 months and will terminate and be of no further force or effect as of the date that is 12 months after the Effective Time.

(b)        No entity or person will be entitled to any indemnification under Section 8.02 with respect to any breach of a representation, warranty, covenant or agreement after the termination thereof pursuant to Section 8.01(a), except for claims previously asserted pursuant to Section 8.03, and the representation, warranty, covenant or agreement that is the subject of such properly asserted claim, and the indemnification obligation of the Escrowing Parties with respect thereto, will survive until such time that such claim is resolved in accordance herewith.

SECTION 8.02.        *Indemnification by the Escrowing Parties.*

(a)        The Noteholders (for purposes of this Article VIII, the "Escrowing Parties"), in accordance with the Payment and Escrow Agreement, will indemnify Buyer, Merger Sub and the Surviving Corporation and their respective affiliates, officers, directors, employees and agents (each, an "Indemnified Party") against and hold them harmless from any loss, liability, damage, demand, claim, cost, suit, action or cause of action, judgment, award, assessment, interest, penalty or expense (including, without limitation, reasonable expenses of investigation, costs of compliance relating to the Excluded Shares (other than those shares defined in Section 2.02(e)(ii)), and reasonable attorneys' and consultants' fees) (any of the foregoing being hereinafter referred to individually as a "Loss" and collectively as "Losses") suffered or incurred by any such indemnified person for or on account of or arising from or in connection with (i) any breach of any representation or warranty of the Company in this Agreement, (ii) any breach of any covenant or agreement of the Company in this Agreement; (iii) the Excluded Shares (other than those shares defined in Section 2.02(e)(ii)); (iv) the ATC Transaction, the Judicial Relief or the Corporate Option Cancellation Transaction, or any third-party Stockholder litigation arising out of or relating to the Merger; (v) Taxes of the Company for any taxable year or period that ends on or before the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, the portion of such taxable year ending on and including the Closing Date; (vi) the failure of the Company to realize at least $500,000 currently in the escrow fund related to the Elrick and Lavidge asset sale; (vii) the matters listed as items 2 and 3 under "Potential Litigation" in Section 3.08 of the

Page 36

Company Disclosure Letter; or (viii) any amount by which the Net Working Capital is less than $9,250,000 immediately prior to the Effective Time.

(b)    The Escrowing Parties will have no obligation under Section 8.02(a) until the aggregate amount of Losses suffered or incurred by the Indemnified Parties exceeds $100,000.    Thereafter, the indemnification obligation of the Escrowing Parties under Section 8.02(a) will be for all Losses in excess of $100,000 suffered or incurred by the indemnified persons thereunder up to the amount of the Escrow Fund from time to time remaining with the Payment and Escrow Agent under the Payment and Escrow Agreement. The limitation described in the preceding two sentences will not apply to indemnification for matters described in Section 8.02(a)(vii), for which the Escrowing Parties will have no obligation until the aggregate amount of Losses suffered or incurred by the Indemnified Parties thereunder exceeds $500,000 (which includes costs of compliance thereunder) and, thereafter, the indemnification obligation of the Escrowing Parties will be for all Losses of the types described in Section 8.02(a)(vii) that are suffered or incurred by the indemnified persons thereunder up to the amount of the Escrow Fund from time to time remaining with the Payment and Escrow Agent under the Payment and Escrow Agreement.  The Escrowing Parties will have no further obligation under the Merger Agreement after the Escrow Fund has been paid or distributed in accordance with the Payment and Escrow Agreement.  The original amount of the Escrow Fund will be $1,910,000 in cash.

SECTION 8.03.    Procedures Relating to Indemnification.

(a)    An Indemnified Party will give prompt written notice to the Escrowing Parties of any Loss in respect of which such Escrowing Parties have a duty to indemnify such Indemnified Party under Section 8.02 (a "Claim"), specifying in reasonable detail the nature of the Loss for which indemnification is sought, the section or sections of this Agreement to which the Claim relates and the amount of the Loss involved (or, if not then determinable, a reasonable good faith estimate of the amount of the Loss involved), except that any delay or failure so to notify the Escrowing Parties will only relieve the Escrowing Parties of their obligations hereunder to the extent, if at all, that they are prejudiced by reason of such delay or failure.

(b)    If a Claim results from any claim, suit, action or cause of action brought or asserted by a third party (a "Third-Party Claim"), the Escrowing Parties will have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party will have the right to employ separate counsel in such Third-Party Claim and participate in such defense thereof, but the fees and expenses of such counsel will be at the expense of the Indemnified Party.  If the Escrowing Parties elect not to, or fail to assume the defense of any Third-Party Claim within 20 days after notice thereof, the Indemnified Party will have the right to undertake the defense, compromise or settlement of such Third-Party Claim for the account of the Escrowing Parties, subject to the right of the Escrowing Parties to assume the defense of such Third-Party Claim with counsel reasonably satisfactory to the Indemnified Party at any time prior to the compromise, settlement or final determination thereof.  Anything in this Section 8.03 to the contrary notwithstanding, the Escrowing Parties will not, without the Indemnified Party's prior written consent (which consent will not be unreasonably withheld or delayed), settle or compromise any Third-Party Claim or consent to the entry of any judgment with respect to any

Page 37

Third-Party Claim that would have an adverse effect on the Indemnified Party. The Escrowing Parties may, without the Indemnified Party's prior written consent, compromise or settle any such Third-Party Claim or consent to entry of any judgment with respect to any Third-Party Claim that requires solely money damages paid by the Escrowing Parties from the Escrow Fund and that includes as an unconditional term thereof the release by the claimant or the plaintiff of the Indemnified Party from all liability in respect of such Third-Party Claim.

(c)     With respect to any Claim other than a Third-Party Claim, the Escrowing Parties will have 20 days from receipt of notice from the Indemnified Party of such Claim within which to respond thereto. If the Escrowing Parties do not respond within such 20-day period, the Escrowing Parties will be deemed to have accepted responsibility to make payment and will have no further right to contest the validity of such Claim. If the Escrowing Parties notify the Indemnified Party within such 20-day period that they reject such Claim in whole or in part, the Indemnified Party will be free to pursue such remedies as may be available to the Indemnified Party under the Payment and Escrow Agreement or applicable law.

(d)     If any Indemnified Party receives insurance proceeds as a result of any Losses with respect to which it has also received an indemnification payment from the Escrowing Parties hereunder, the Indemnified Party will pay the amount of such insurance proceeds (but not in excess of the indemnification payment actually received from the Escrowing Parties with respect to such Losses hereunder), as such insurance proceeds are actually received by the Indemnified Party, to the Agent for redeposit into the Escrow Fund; provided that if the Indemnified Party receives insurance proceeds on or after the first anniversary of the Closing Date, the Indemnified Party will pay such insurance proceeds to the Escrowing Parties from whom the related indemnification payment was received.

SECTION 8.04.     *Tax Matters.*

(a)     (i)     Solely during the period beginning at the Effective Time and ending at 11:59 p.m. on the Closing Date, Buyer agrees to cause the Surviving Corporation not to take any actions other than actions in the ordinary course of the business of the Surviving Corporation. Buyer and the Surviving Corporation will indemnify the Escrowing Parties for Taxes of the Company for any taxable year or period that begins after the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, the portion of such taxable year beginning on the day after the Closing Date.

(ii)     For purposes of Section 8.02(a)(v) and Section 8.04(a)(i), whenever it is necessary to determine the liability for Taxes of the Company for a portion of a taxable year or period that begins before and ends after the Closing Date, the determination of such Taxes for the portion of the year or period ending on, and the portion of the year or period beginning after, the Closing Date will be determined by assuming that the Company had a taxable year or period which ended at the close of the Closing Date.

(b)     Buyer will cause the Surviving Corporation and each of its subsidiaries to prepare and timely file all required Tax Returns for the taxable years or periods ending on or before, or including any time period prior to, the Closing Date that are due after the Closing Date. Such Tax Returns will be prepared consistently with the prior practice of the Company

Page 38

and each of its subsidiaries. Buyer will provide each such Tax Return to the Representative at least 20 days before the due date of such Tax Return for the Representative's review and comment and will make any changes to each such Tax Return reasonably requested by the Representative.

SECTION 8.05.    *Characterization of Indemnification Payments.*  All amounts paid by the Escrowing Parties to any Indemnified Party pursuant to this <u>Article VIII</u> will be treated as adjustments to the Cash Consideration for all Tax purposes.

SECTION 8.06.    *Exclusive Remedy.*  From and after the Effective Time, the indemnification rights provided in this <u>Article VIII</u> will be the sole and exclusive remedy available to the Indemnified Parties with respect to any breach of the representations, warranties, covenants or agreements of the Company in this Agreement.

## ARTICLE IX

## TERMINATION

SECTION 9.01.    *Termination.*  This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after approval of this Agreement and the Merger by the Stockholders:

(a)    by mutual written consent of Buyer and the Company;

(b)    by Buyer, upon the material inaccuracy of any representation or warranty of the Company, or the material breach of any covenant or agreement on the part of the Company set forth in this Agreement, or if any representation or warranty of the Company will have become untrue in any material respect, which breach is not cured within 30 days of written notice thereof to the party committing such breach; provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein;

(c)    by Buyer, if any condition set forth in <u>Section 7.01</u> or <u>Section 7.02</u> has not been satisfied by Closing or is not capable of being satisfied by November 30, 2003, which breach is not cured within 30 days of written notice thereof to the party committing such breach; provided that Buyer is not then in material breach of any representation, warranty, covenant or other agreement contained herein;

(d)    by the Company, upon the material inaccuracy of any representation or warranty of Buyer or Merger Sub, or the material breach of any covenant or agreement on the part of Buyer or Merger Sub set forth in this Agreement, or if any representation or warranty of Buyer or Merger Sub will have become untrue in any material respect, which breach is not cured within 30 days of written notice thereof to the party committing such breach; provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein;

(e)    by the Company, if any condition set forth in <u>Section 7.01</u> or <u>Section 7.03</u> has not been satisfied by Closing or is not capable of being satisfied by November 30, 2003,

Page 39

2003, which breach is not cured within 30 days of written notice thereof to the party committing such breach; provided that the Company is not then in material breach of any representation, warranty, covenant or other agreement contained herein;

(f)    by either Buyer or the Company if there is any Order that is final and nonappealable preventing the consummation of the Merger;

(g)    by either Buyer or the Company if the Merger is not consummated before November 30, 2003 or, if the only condition remaining to be satisfied on October 31, 2003 is the termination or release of options or warrants to purchase capital stock of the Company or one of its subsidiaries, before October 31, 2003; provided, however, that the right to terminate this Agreement under this Section 9.01(g) will not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Merger to occur as of such date;

(h)    by Buyer or the Company (provided that the terminating party is not in material breach of any of its representations, warranties or covenants under this Agreement), if the Merger Vote has not been obtained by reason of the failure to obtain the required vote at a duly held meeting of the Stockholders or of any adjournment thereof at which the vote was taken;

(i)    by Buyer, if the Board of Directors of the Company has (i) failed to recommend the adoption of the Agreement by the Stockholders in accordance with Section 6.01, or has changed, withdrawn, modified or qualified such recommendation (or resolved to take any such action), whether or not permitted by the terms hereof, (ii) materially breached its obligations under this Agreement by reason of a failure to call the Stockholders Meeting in accordance with Section 6.01 or a failure to prepare and mail to the Stockholders the Proxy Statement in accordance with Section 6.02, or (iii) notified Buyer that its Board of Directors has decided to accept a Superior Proposal;

(j)    by the Company or the Buyer if the Board of Directors of the Company has decided to accept a Superior Proposal; or

(k)    by the Company, if the Board of Directors of the Company has changed, withdrawn, modified or qualified its recommendation to the Stockholders regarding approval of the Merger in a manner adverse to Buyer or has resolved to do any of the foregoing.

SECTION 9.02.    *Effect of Termination.*

(a)    In the event of any permitted termination of this Agreement by either the Company or Buyer as provided in Section 9.01, this Agreement will forthwith become void and there will be no liability or obligation on the part of any of the parties or their respective officers or directors except with respect to Section 3.12, Section 4.04, Section 5.04(b), this Section 9.02, Section 9.03 and Article X, which provisions will survive such termination, and except that, notwithstanding anything to the contrary contained in this Agreement, (i) all obligations of the Buyer or Merger Sub to indemnify or reimburse the Company under Article VIII or Article IX hereof will terminate in the event this Agreement is terminated by Buyer or the Company

pursuant to <u>Section 9.01(i)</u>, <u>(j)</u> or <u>(k)</u> and (ii) neither Buyer nor the Company will be relieved or released from any liabilities or damages arising out of its willful breach of this Agreement.

(b)    If this Agreement is terminated as a result of any breach of a representation, warranty, covenant or other agreement which is caused by the willful breach of a party hereto, such party shall be liable to the other party for all out-of-pocket costs and expenses, including, without limitation, the reasonable fees and expenses of lawyers, accountants and investment bankers, incurred by such other party in connection with the entering into of this Agreement and the carrying out of any and all acts contemplated hereunder ("Expenses"). The payment of Expenses is not an exclusive remedy, but is in addition to any other rights or remedies available to the parties hereto at law or in equity.

(c)    In the event this Agreement is terminated by:

(i)    Buyer pursuant to <u>Section 9.01(i)</u>;

(ii)    either Buyer or the Company pursuant to <u>Section 9.01(j)</u>;

(iii)    the Company pursuant to <u>Section 9.01(k)</u>; or

(iv)    either Buyer or the Company pursuant to <u>Section 9.01(g)</u> in circumstances where both (A) within 12 months of such termination, the Company has entered into an agreement to engage in or there has otherwise occurred a merger, consolidation or similar transaction involving the Company or a purchase, lease or other acquisition of all or substantially all of the assets of the Company (an "Acquisition Transaction") with or by any person other than Buyer or any Affiliate of Buyer, and (B) at the time of such termination or event giving rise to such termination, it has been publicly announced that any person or entity (other than Buyer or an Affiliate of Buyer) has made, or disclosed an intention to make, a bona fide offer to engage in an Acquisition Transaction with the Company,

then the Company will pay to Buyer a break-up fee in cash in the amount of $1,137,500 (the "Break-Up Fee") upon such termination by wire transfer of immediately available funds to an account designated by Buyer within two business days after lawful demand by Buyer; provided, however, that the Company will not be required to pay the Break-Up Fee if, immediately prior to the termination of this Agreement, Buyer was in material breach of any of its obligations under this Agreement.

(d)    The parties acknowledge that the agreements contained in this <u>Section 9.02</u> and in <u>Section 9.03</u> are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, none of the parties would enter into this Agreement; accordingly, if the Company or Buyer fails promptly to pay any amount due pursuant to this <u>Section 9.02</u> or <u>Section 9.03</u>, and, in order to obtain such payment, the party that has not been so paid commences a suit which results in a judgment against either the Company or Buyer, the non-paying party will pay to the other party its costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest on the amount of the fee at the prime rate of Citibank, N.A. in effect on the date such payment was required to be made. The parties agree that any remedy or amount payable pursuant to this <u>Section 9.02</u> will not preclude any other remedy or amount payable hereunder and will not be an

exclusive remedy for any breach of any representation, warranty, covenant or agreement contained in this Agreement.

SECTION 9.03.    *Fees and Expenses.*  Without limiting Section 9.02, whether or not the Merger is consummated, each party to this Agreement will pay all Expenses (defined below) incurred by it, except as otherwise set forth herein, and except that, if the Merger is consummated, (a) the Surviving Corporation will pay, or cause to be paid, any and all transfer taxes imposed in connection with the Merger (which in any event will not be indemnifiable by the Escrowing Parties), and (b) Buyer will pay all fees and expenses of the Agent under the Payment and Escrow Agreement.  As used in this Agreement, "Expenses" means all out-of-pocket expenses (including, without limitation, financing commitment fees and all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its affiliates and any broker's or finder's fees) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby and thereby, including the preparation, printing, filing and mailing of the Proxy Statement and the solicitation of the approval of the Stockholders and all other matters related to the transactions contemplated hereby and thereby.

## ARTICLE X

## GENERAL PROVISIONS

SECTION 10.01.    *Notices.*  All notices and other communications given or made pursuant hereto will be in writing and will be deemed to have been duly given upon receipt, if delivered personally, mailed by registered or certified mail (postage prepaid, return receipt requested) to the parties at the following addresses (or at such other address for a party as will be specified by like changes of address) or sent by electronic transmission to the facsimile number specified below:

(a)    If to either of Buyer or Merger Sub, to:

AllServe Systems plc
Technology Transfer Centre
Silverwood Park
Bockhurst Road, Berkshire SL5 7PW
Ascot, UK
Attention:  A.K. Sen
Facsimile:  011-44-1344626781
            011-44-1344626782

with a copy to:

Thacher Proffitt & Wood
25 DeForest Avenue
Summit, NJ 07901
Attention:  Michael E. Helmer, Esq.
Facsimile:  (908) 598-5710

Page 42

(b)     If to the Company, to:

> Aegis Communications Group, Inc.
> 7880 Bent Branch Drive, Suite 150
> Irving, Texas 75063
> Attention: Chief Executive Officer
> Facsimile: (678) 443-6502

with a copy to:

> Hughes & Luce, LLP
> 1717 Main Street, Suite 2800
> Dallas, Texas 75201
> Attention: David G. Luther
> Facsimile: (214) 939-5849

SECTION 10.02.     *Certain Definitions.*  For the purposes of this Agreement, the term:

(a)     "affiliate" means a person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned person.

(b)     a person will be deemed a "beneficial owner" of or to have "beneficial ownership" of Company Common Stock in accordance with the interpretation of the term "beneficial ownership" as defined in Rule 13d-3 under the Exchange Act, as in effect on the date hereof; provided that a person will be deemed to be the beneficial owner of, and to have beneficial ownership of, Company Common Stock which such person or any affiliate of such person has the right to acquire (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise.

(c)     "control" (including the terms "controlled," "controlled by," and "under common control with") means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of stock or as trustee or executor, by contract or credit arrangement or otherwise.

(d)     "knowledge" or "known" means with respect to any matter in question, as to the Company, the knowledge, after reasonable inquiry, of the executive officers of the Company on the date of the execution of this Agreement, as well as Michael Graham in his capacity as a former executive officer of the Company (but only through the termination date of his employment with the Company), and as to Buyer, the knowledge, after reasonable inquiry, of the executive officers of Buyer on the date of the execution of this Agreement.

(e)     "Liens" means all security interests, liens, claims, pledges, agreements, charges or other encumbrances of any nature whatsoever.

007157.00066:782833.012

(f)    "person" means an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, other entity or group (as used in Section 13(d) of the Exchange Act).

(g)    "subsidiary" or "subsidiaries" of the Company, Buyer, the Surviving Corporation or any other person, means any corporation, partnership, joint venture or other legal entity of which the Company, Buyer, the Surviving Corporation or any such other person, as the case may be (either alone or through or together with any other subsidiary), owns, directly or indirectly, 50% or more of the stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

(h)    "Tax" or "Taxes" means any and all taxes, charges, fees, levies, assessments, duties or other amounts payable to any federal, state, local or foreign taxing authority or agency, including, without limitation, (i) income, franchise, profits, gross receipts, minimum, alternative minimum, estimated, ad valorem, value added, sales, use, service, real or personal property, capital stock, license, payroll, withholding, disability, employment, social security, workers compensation, unemployment compensation, utility, severance, excise, stamp, windfall profits, transfer and gains taxes, (ii) customs, duties, imposts, charges, levies or other similar assessments of any kind, and (iii) interest, penalties and additions to tax imposed with respect thereto.

SECTION 10.03.    *Headings and Table of Contents.*  The headings and the table of contents contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. Section references herein are, unless the context otherwise requires, references to sections of this Agreement.

SECTION 10.04.    *Severability.*  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

SECTION 10.05.    *Entire Agreement.*  This Agreement, together with the Exhibits, the Company Disclosure Letter, the Buyer Disclosure Letter, the Payment and Escrow Agreement and the Confidentiality Agreement, constitutes the entire agreement of the parties and supersede all prior agreements and undertakings, both written and oral, among the parties or between any of them, with respect to the subject matter hereof.

SECTION 10.06.    *Assignment, Binding Effect.*  Neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties, except that Buyer and/or Merger Sub may assign this Agreement to a direct or indirect wholly-owned

Page 44

subsidiary; provided that such assignment will not relieve Buyer of any of its liabilities or obligations under this Agreement. Subject to the preceding sentence, this Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and assigns. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement; provided that the third parties referenced in Section 6.03 and Article VIII will be third-party beneficiaries of the agreements contained therein.

SECTION 10.07.    *Interpretation.*  In this Agreement, unless the context otherwise requires, words describing the singular number will include the plural and vice versa, and words denoting any gender will include all genders and words denoting natural persons will include other persons.

SECTION 10.08.    *Specific Performance.*  The parties hereby acknowledge and agree that the failure of any party to perform its agreements and covenants hereunder, including its failure to take all actions as are necessary on its part to the consummation of the Merger, will cause irreparable injury to the other parties for which damages, even if available, will not be an adequate remedy.  Accordingly, each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder.

SECTION 10.09.    *Amendment.*  This Agreement may be amended by the parties hereto by action taken by or on behalf of their respective Boards of Directors, as applicable, at any time prior to the Effective Time; provided however, that, after approval of the Merger by the Merger Vote, no amendment that, under applicable Law, may not be made without the approval of the Stockholders may be made without such further approval.  This Agreement may not be amended except by an instrument in writing signed by the parties hereto.

SECTION 10.10.    *Waiver.*  At any time prior to the Effective Time, any party hereto may (a) extend the time for the performance of any of the obligations or other acts of any other party hereto, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance by any other party with any of the agreements or conditions contained herein.  Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.  For purposes of this Section 10.10, Buyer and Merger Sub as a group will be deemed to be one party.  No failure or delay on the part of any party hereto in the exercise of any right hereunder will impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor will any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

SECTION 10.11.    *Governing Law.*  This Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its rules on conflicts of law.

SECTION 10.12.    *Counterparts.*  This Agreement may be executed in multiple counterparts, and by the different parties hereto in separate counterparts, each of which when

executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.

**[SIGNATURE PAGE FOLLOWS]**

[TPW: NYLEGAL:156436.2] 19935-00000  06/26/2003 2:22 PM

007157.00066:782833.012

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ALLSERVE SYSTEMS PLC

By:_____
    Name: _____
    Title: _____

ALLSERVE SYSTEMS, INC.

By:_____
    Name: _____
    Title: _____

AEGIS COMMUNICATIONS GROUP, INC.

By:_____
    Name: _____
    Title: _____

# Exhibit B

# Thacher Proffitt

Thacher Proffitt & Wood LLP
25 DeForest Avenue
Summit, NJ 07901
908.598.5700

Fax: 908.598.5710
www.tpwlaw.com

10/21/03

~~September 5, 2003~~

| MESSAGE TO: |
|---|

**Name:**          **Company:**                    **Facsimile:**          **Phone:**

DAVID Luttner

| MESSAGE FROM: |
|---|

**Name:**          Michael E. Helmer

**Title:**          Partner

**Telephone:**     908.598.5757

**Fax Number:**    908.598.5710

Total number of pages sent (including this cover sheet):

IF YOU DID NOT RECEIVE THE NUMBER OF PAGES SHOWN ABOVE, OR IF ANY COPIES ARE ILLEGIBLE, PLEASE CALL THE TELECOMMUNICATIONS OPERATOR AT:

MESSAGE:

The information contained in this facsimile message is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient or is the employee or agent responsible for delivering it to the intended recipient, the reader is hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this message in error, please notify us by telephone immediately and return the original message to us at the above address via the U.S. Postal Service. Thank you.

October 21, 2003



VIA FACSIMILE (678) 443-6502
Aegis Communications Group, Inc.
7880 Bent Branch Drive, Suite 150
Irving, Texas 75063

Attention: Herman Schwarz, Chief Executive Officer

Re:   Notice Under Section 1.02 of the Agreement and Plan of Merger

Dear Herman:

This written notice is being provided by AllServe Systems Plc ("Buyer") and AllServe

Systems Inc. ("Merger Sub") to Aegis Communications, Inc. ("Company") pursuant to 1.02 of

the Agreement and Plan of Merger, dated as of July    , 2003, by and among Buyer, Merger Sub

and the Company (the "Definitive Agreement"). Any capitalized words herein not defined

herein shall have the meanings set forth in the Definitive Agreement. We have been informed by

you through your attorneys that all of the conditions to be satisfied by the Company prior to

Closing have been or will be satisfied with the following exceptions: 1) Section 7.02 (e) -

Receipt of Third Party Consent from GE regarding switch financing in Missouri; (2) Section

7.02 (h) - Receipt of updated Company financial statements reviewed by the Company's

auditors; and (3) Section 7.02 (o) - Certain employees of the Company entering into employment

agreements with the Surviving Corporation. Please be advised that each of the unsatisfied

conditions set forth in Sections (1), (2) and (3) above are hereby waived by the Buyer and the

Merger Sub.

## Allserve Systems PLC.

Technology Transfer Centre, Silwood Park, Buckhurst Road, Berkshire SI5 7PW, Ascot, UK
Ph : +44 1344 293 000  Fax : +44   1344 626 782
email : europe@allservesystems.com
Registered in UK No : 288 1682

[TPP NYLEGAL:82621.4] 19935-00000  10/21/2003 4:00 PM

50        50        50

The Board of Directors
October 21, 2003                                                                                    Page 2

The undersigned further acknowledges that the draft provided to the undersigned of the

BDO Opinion and Side Letter referred to in Section 7.02 (r) of the Definitive Agreement will

be acceptable to the undersigned for delivery at Closing   All other conditions set forth in

Section 7.01 and Section 7.03 have been or will be satisfied at Closing.   Accordingly, please

be advised that this letter shall constitute notice under Section 1.02 of the Definitive Agreement

to close the transactions contemplated thereunder on Friday, October 24, 2003 at the New

York City offices of our attorneys, Thacher Proffitt & Wood   The undersigned are also ready,

willing and able to close prior to October 24, 2003 and would happy to do so upon the

Company's concurrence   Please advise accordingly

                                        Very truly yours,

ALLSERVE SYSTEMS PLC                                     ALLSERVE     SYSTEMS,
INC.


A.K. Sen                                                A.K. Sen
Chairman                                                President

cc  David G. Luther, Esq. (via facsimile (214) 939-5849)
    Hughes & Luce, LLP
    1717 Main Street, Suite 2800
    Dallas, Texas 75201



**Allserve Systems PLC.**

Technology Transfer Centre, Silwood Park, Buckhurst Road, Berkshire Sl5 7PW, Ascot, UK
Ph : +44 1344 293 000  Fax : +44  1344 626 782
email : europe@allservesystems.com
Registered in UK No : 288 1682

[NYLEG:01182621.4] 19935-00000 10/21/2003 4:00 PM
50

# Exhibit C

_Mr. A K. Sen._

 **Aegis**

October 22, 2003

VIA FACSIMILE    011-44-1344626781
011-44-1344626782

AllServe Systems plc
Technology Transfer Centre
Silverwood Park
Bockhurst Road, Berkshire SL5 7PW
Ascot, UK
Attention: A.K. Sen

Re:    Response to Notice Under Section 1.02 of the Agreement and Plan of Merger

Dear Mr. Sen:

We understand that, as you stated in the notice you provided to us yesterday under Section 1.02 of the Agreement and Plan of Merger (the "Agreement"), you would like to close the transactions contemplated by the Agreement (the "Merger") on Friday of this week. At this time, our Board of Directors is still working to assess and comply with its fiduciary duties with respect to the Merger and the other unsolicited bona fide written acquisition proposals of which we have notified you in accordance with the terms and conditions of the Agreement. The Board does not believe that it will have concluded this process by Friday of this week.

In addition to the Board's need to fulfill its fiduciary responsibilities, there are two practical obstacles to closing on Friday. First, you have not yet informed us on the specifics of how you intend to handle the assumption or replacement of our outstanding letters of credit, which are necessary to our continued operations post-closing. We are not certain, at this point, that the letters of credit could be dealt with by Friday of this week, assuming we knew how you wanted to handle this issue. Second, because this weekend is a payroll weekend, which, as you know, requires the attention of certain members of our finance staff who are essential to conducting a closing of the Merger, there are substantial logistical problems with closing on Friday.

For these reasons, we will not be prepared to close the Merger on Friday. Because we need to allow time for the Board to continue to work through fiduciary issues, we cannot set a definitive date at this time. We will let you know as soon as possible when we can schedule a definitive closing date. This does not mean that we are terminating the agreement between Aegis and AllServe. If you disagree with this course of action, please let us know.

Finally, to provide us with greater certainty as we prepare for a closing:

007137.00066:806849.02

Aegis Communications Group, Inc.
7000 Central Parkway, Suite 1150 • Atlanta, GA 30328 • Tel 678.443.6500 • Fax 678.443.6553

- please confirm that the drafts of the disclosure letter supplement that we have provided to you do not contain anything that breaches or violates any condition contained in Section 7.02(a), (b) or (c);

- please confirm that the current draft opinion of our legal counsel, which differs from the form attached as an exhibit to the Agreement, is satisfactory to you; and

- please inform us at your earliest convenience how you wish to handle the above-referenced letters of credit so that we may get this process underway.

Please contact me with responses to the above questions, or if you have any questions on the above. Thank you for your understanding.

Very truly yours,

AEGIS COMMUNICATIONS GROUP, INC.

By: _____
Name: Herman M. Schwarz
Title: President and Chief Executive Officer

cc:    Michael E. Helmer, Esq. (via facsimile (908) 598-5710)
       Thacher Proffitt & Wood
       25 DeForest Avenue
       Summit, NJ 07901

007157.00066:806849.02

# Exhibit D

OCT 23 2003 3:58PM                                                    P. 1



October 21, 2003

VIA FACSIMILE (678) 443-6502
Aegis Communications Group, Inc.
7880 Bent Branch Drive, Suite 150
Irving, Texas 75063

Attention: Herman Schwarz, Chief Executive Officer

　　Re:　　Notice Under Section 1.02 of the Agreement and Plan of Merger

Dear Herman:

　　　　This written notice is being provided in connection with the Agreement and Plan of
Merger, dated as of July 11, 2003 (the "Definitive Agreement"), by and among AllServe
Systems Plc ("Buyer") and AllServe Systems Inc. ("Merger Sub") and Aegis Communications,
Inc. ("Company"). Any capitalized words herein not defined herein shall have the meanings set
forth in the Definitive Agreement. We are in receipt of your letter dated October 22, 2003
relating to the Closing scheduled for this Friday, October 24, 2003. None of the issues raised in
your letter constitute a legal basis by the Company for delaying Closing. Buyer and Merger Sub
reiterate that they are ready, willing and able in every respect to Close on October 24, 2003 and
expect that the appropriate officials of the Company will be present at the New York offices of
our attorneys, Thacher Proffitt & Wood, on that day in order to effect the same.

　　　　　　　　　　　　　　Very truly yours,

ALLSERVE SYSTEMS PLC                            ALLSERVE SYSTEMS, INC.


A.K. Sen                                        A.K. Sen
Chairman                                        President

cc: David G. Luther, Esq. (via facsimile (214) 939-5849)
    Hughes & Luce, LLP
    1717 Main Street, Suite 2800
    Dallas, Texas 75201



## Allserve Systems PLC.

Technology Transfer Centre, Silwood Park, Buckhurst Road, Berkshire Sl5 7PW, Ascot, UK
Ph : +44 1344 293 000  Fax : +44  1344 626 782
email : europe@allservesystems.com
Registered in UK No : 288 1682

[PW:NYLEGAL:183496621999999-00000  10/23/2003 12:09 PM]

# Exhibit E



October 24, 2003

**VIA FACSIMILE (678) 443-6502**
**Aegis Communications Group, Inc.**
**7880 Bent Branch Drive, Suite 150**
**Irving, Texas 75063**

**Attention: Herman Schwarz, Chief Executive Officer**

Re: __Notice Under Section 1.02 of the Agreement and Plan of Merger__

Dear Herman:

This written notice is being provided in connection with the Agreement and Plan of Merger, dated as of July 11, 2003 (the "Definitive Agreement"), by and among AllServe Systems Plc ("Buyer") and AllServe Systems Inc. ("Merger Sub") and Aegis Communications, Inc. ("Company"). Any capitalized words not defined herein shall have the meanings set forth in the Definitive Agreement. We are in receipt of your letter dated October 24, 2003 relating to the Closing scheduled for today, Friday, October 24, 2003. Your understanding of our letter of October 22, 2003 is incorrect. The conditions referred to in Sections (1), (2) and (3) of that letter were waived. We are also willing to accept the revised opinion letter your counsel provided to us. The other conditions of Buyer or Merger Sub either have been satisfied or clearly can be satisfied by the Company at Closing. With respect to the Supplemental Disclosure Letter, despite our requests, we have not yet received adequate details regarding certain items. Accordingly, we are unable to adequately ascertain the extent of the liabilities set forth thereon or the circumstances under which such liabilities were incurred, and thus whether any of those items constitute a breach under the Definitive Agreement. However, despite these deficiencies, Buyer and Merger Sub are ready, willing and able to close today and reserve all of their rights and remedies under the Agreement with respect thereto or otherwise, which rights and remedies shall survive the Closing.

Very truly yours,

ALLSERVE SYSTEMS PLC                    ALLSERVE SYSTEMS, INC.

A.K. Sen                                A.K. Sen
Chairman                                President

cc: David G. Luther, Esq. (via facsimile (214) 939-5849)
    Hughes & Luce, LLP
    1717 Main Street, Suite 2800
    Dallas, Texas 75201

**Allserve Systems PLC.**

[TP\.../LEGAL/.../8.1] 99999-00000 10/24/2003 3:31 PM

Technology Transfer Centre, Silwood Park, Buckhurst Road, Berkshire Sl5 7PW, Ascot. UK
Ph : +44 1344 293 000  Fax : +44  1344 626 782
email : europe@allservesystems.com
Registered in UK No : 288 1682

# Exhibit F

TOTAL P.01

Nov 05 03 11:36a      Herman M. Schwarz          678-443-6502          P.2

 **Aegis**

November 5, 2003

VIA FACSIMILE  011-44-1344626781
               011-44-1344626782

AllServe Systems plc
Technology Transfer Centre
Silverwood Park
Bockhurst Road, Berkshire SL5 7PW
Ascot, UK
Attention: A.K. Sen

    Re:   AllServe Systems plc/Aegis Communications Group, Inc.

Dear Mr. Sen:

    We hereby terminate in accordance with its terms the Agreement and Plan of Merger, dated as of July 11, 2003, by and among AllServe Systems plc, AllServe Systems, Inc. and Aegis Communications Group, Inc. (the "Agreement"), including without limitation Section 9.01(j). You should be advised that our Board of Directors has voted to engage in another transaction, which our Board of Directors has determined to be a Superior Proposal (as defined in the Agreement) and which we are closing on Wednesday, November 5, 2003. Also, please note our position that Buyer (as defined in the Agreement) has failed to fully perform under, or comply with, the Agreement.

    We should promptly engage in further discussions to address the repayment of sums owing by Buyer to us.

                      Very truly yours,

                      AEGIS COMMUNICATIONS GROUP, INC.

                      By:

                      Name: Herman M. Schwarz
                      Title: President and Chief Executive Officer

    cc:    Michael E. Helmer, Esq. (via facsimile (908) 598-5710)
          Thacher Proffitt & Wood
          25 DeForest Avenue
          Summit, NJ 07901

Aegis Communications Group, Inc.
7000 Central Parkway, Suite 1150 • Atlanta, GA 30328 • Tel 678.443.6500 • Fax 678 443.6553

# Exhibit G



November 6, 2003

VIA FACSIMILE  (678) 443-6502
Aegis Communications Group, Inc.
7880 Bent Branch Drive, Suite 150
Irving, Texas  75063

Attention: Herman Schwarz, Chief Executive Officer

Re:    Notice Under Section 9.02 of the Agreement and Plan of Merger

Dear Herman:

This written notice is being provided in connection with the Agreement and Plan of Merger, dated as of July 11, 2003 (the "Definitive Agreement"), by and among AllServe Systems Plc ("Buyer") and AllServe Systems Inc. ("Merger Sub") and Aegis Communications, Inc. ("Company"). Any capitalized words herein not defined herein shall have the meanings set forth in the Definitive Agreement. We are in receipt of your letter dated November 5, 2003. This letter shall constitute lawful demand by Buyer to pay the Break-Up Fee ($1,137,500) by wire transfer to the account listed in the attached wire instructions within two (2) business days of the date of this letter. Further, please be advised that, pursuant to Section 5.03(b) (ii) of the Definitive Agreement, the Company and its Board of Directors have no right to agree to, approve or recommend a Superior Proposal unless and until the Company makes the required payment under Section 9.02(c).

Please be advised that the Buyer and Merger Sub hereby reserve all of their rights and remedies under the Agreement, in law or at equity, including, without limitation, all rights and remedies arising from the Company's breach of the representations, warranties, covenants or agreements contained in the Definitive Agreement.

Very truly yours,

ALLSERVE SYSTEMS PLC                    ALLSERVE SYSTEMS, INC.

A.K. Sen                                A.K. Sen
Chairman                                President

cc:  David G. Luther, Esq. (via facsimile (214) 939-5849)
     Hughes & Luce, LLP
     1717 Main Street, Suite 2800
     Dallas, Texas  75201




**Allserve Systems PLC.**
Technology Transfer Centre, Silwood Park, Buckhurst Road, Berkshire SL5 7PW, Ascot, UK
Ph: + 44 1344 870 451 Fax: + 44 1344 626 781
email: europe@allservesystems.com, www.allservesystems.com
Registered in UK No. : 288 1682

# Exhibit H

## HUGHES·LUCE LLP
ATTORNEYS AND COUNSELORS

1717 Main Street, Suite 2800
Dallas, Texas 75201
214.939.5500
214.939.6100 fax

November 7, 2003

hugheslucc.com

David G. Luther, Jr.
214.939.5541
luther@hugheslucc.com

Via Facsimile (908) 598-5710

Michael E. Helmer
Thacher Proffitt & Wood
25 De Forest Ave.
Summit, NJ  07901

Re:   Aegis Communications Group Inc./AllServe Systems plc

Dear Mike:

As I promised in our phone call yesterday, I am responding on behalf of my client, Aegis Communications Group, Inc ("Aegis"), to the written notice, dated November 6, 2003, from your clients, AllServe Systems, plc ("Buyer") and AllServe Systems, Inc. ("Merger Sub"), to Aegis regarding demand for a break-up fee ($1,137,500) pursuant to the Agreement and Plan of Merger ("Merger Agreement"), dated July 11, 2003, by and among Buyer, Merger Sub and Aegis. It is Aegis's position that under Section 9.02(c) of the Merger Agreement the break-up fee is not owed. Moreover, because under Section 9.02(c) the break-up fee is not owed, Aegis and its Board of Directors did have the right, contrary to the assertion in Buyer's November 6, 2003 notice, to close as and when Aegis did. Please be advised that Aegis hereby reserves all its rights and remedies under the Agreement, in law or at equity, including, without limitation, all rights and remedies arising from the breach by Buyer or Merger Sub of any of the representations, warranties, covenants or agreements contained in the Definitive Agreement.

Also as I mentioned on our phone call and as was stated in Aegis's November 5, 2003 termination notice, Aegis must be made whole with respect to the amounts expended by Aegis on behalf of, or for services provided to, Buyer or Merger Sub, and we hereby make demand for all amounts owed. The amounts owed are set forth in Attachment "A" to this letter.

Aegis is ready to discuss these matters, and I believe they could be resolved by as early as Monday, November 11, 2003. Please give me a call after you have received this letter. Over the weekend, you should be able to reach me on my cell phone at 214/912-3787.

Very truly yours,

David G. Luther, Jr.

THACHER & PROFFITT     Fax:908-598-5710          Nov 10 2003  11:28     P.04

11-07-2003   05:13pm   From-HUGHES&LUCE LLP          +2149386106          T-217  P 003/004  F-408

# HUGHES ◆ LUCE LLP

Michael E. Helmer
November 7, 2003
Page 2

cc:   Herman Schwarz
      Tom Franklin
      Scot Brunke

tR17157 tRt07t tRtVt33 t3

OJS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
AllServe Systems PLC and AllServe Systems, Inc.

## DEFENDANTS
Aegis Communications Group, Inc.

(b) County of Residence of First Listed Plaintiff **United Kingdom**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed **Dallas County, Texas**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Dennis A. Meloro, Esq.
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000

Attorneys (If Known)
R. Hudson Scaggs, Jr., Esq.
Charles D. Reed, Esq.
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
#### PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

#### PERSONAL INJURY
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury— Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

#### PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
- **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1452
Brief description of cause:
Breach of contract and breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
DEMAND In excess of $50 million, injunctive and declaratory relief, costs and fees and expenses
CHECK YES only if demanded in complaint: UNDER F.R.C.P. 23
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE _____   DOCKET NUMBER _____

DATE
August 4, 2006

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

American LegalNet, Inc.
www.USCourtForms.com

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

0 6 - 4 8 3 -

Civil Action No. _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

| | |
|---|---|
| 4-4-06 | Ben Longeed |
| (Date forms issued) | (Signature of Party or their Representative) |
| | Ben Longeed |
| | (Printed name of Party or their Representative) |

Note: Completed receipt will be filed in the Civil Action